**Preston James McCLANAHAN and Marilyn McClanahan, husband and wife; Margaret T. Morris; Laura L. Morris and Scott A. Morris, by their mother and next friend, Margaret T. Morris, Plaintiffs,**

v.

**AMERICAN GILSONITE COMPANY, a Delaware Corporation, Standard Oil Company of California, a Delaware Corporation, and Chevron Research Company, a Delaware Corporation, Defendants.**

Civ. A. No. 77–C–1127.

United States District Court, D. Colorado.

July 21, 1980.

Clayton D. Tipping, Grand Junction, Colo., Stuart H. Pack, Michael A. Williams, Sherman & Howard, Denver, Colo., for plaintiffs.

David G. Palmer, William W. Maywhort, Holland & Hart, Peter F. Jones, Hall & Evans, Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

CARRIGAN, District Judge.

THIS MATTER is before the Court on motions for summary judgment filed by defendants American Gilsonite Company ("Gilsonite"), Standard Oil Company of California ("Socal") and Chevron Research Company ("CRC"). As discussed in detail below, Socal's and CRC's motions, which are identical, are granted as to one plaintiff—Margaret T. Morris—and denied as to the remaining plaintiffs. Gilsonite's motion is granted in part and denied in part.

### I. Facts.[1]

On November 15, 1977, the plaintiffs filed their original complaint in the state district court for Mesa County, Colorado, and the action was removed to this Court in December of that year.[2] That complaint sought damages for personal injuries and wrongful death caused by an oil refinery accident on November 16, 1975. The accident occurred at the Mesa Refinery, in Fruita, Colorado, which at the time was owned and operated by Gary Operating Company ("Gary"). The original complaint did not name Socal or CRC as defendants. It did, however, include as a defendant Chevron U.S.A., Inc., a wholly-owned subsidiary of Socal.

The complaint was served on Chevron U.S.A. on November 21, 1977. On December 16, 1977, Chevron U.S.A. moved to dismiss the complaint on the ground that it had never had any interest or involvement in the Mesa Refinery. The plaintiffs confessed that motion, and this Court entered an order of dismissal on January 24, 1978.

---

1. Most of the facts pertinent to these motions are undisputed and, unless otherwise expressly noted, will be treated as such in this opinion.

2. The Court has jurisdiction pursuant to 28 U.S.C. § 1332.

The plaintiffs filed a Second Amended Complaint in February 1978, naming Socal as a defendant. The Second Amended Complaint was served on Socal on March 6, 1978.

On September 25, 1978, following this Court's rulings on other motions which do not affect the issues here, the plaintiffs filed a Third Amended Complaint, which for the first time named CRC as a defendant in this case. The Third Amended Complaint was served on CRC on October 13, 1978. CRC is a wholly-owned subsidiary of Socal.

As noted above, at the time of the accident the Mesa Refinery was owned and operated by Gary Operating Company. On December 21, 1973, Gary had purchased the refinery, together with certain other assets, from Gilsonite. In the 1950's Gilsonite had contracted with other parties, including Socal and CRC, for the design, construction, and start-up of the refinery, which was originally designed primarily to extract oil and other petroleum products from a solid ore known as gilsonite. The refinery began operation in 1957, and was used to process gilsonite, as well as some crude oil, from 1957 until January 23, 1973. On the latter date, a fire destroyed the refinery's melt tank.

After the 1973 fire, Gilsonite did not rebuild the refinery as it had been constructed originally, but rather converted it for use solely as a crude oil refinery. There are factual disputes as to what physical alterations were required by this conversion, or at least as to the significance of the changes made, but it is one of the plaintiffs' allegations that the changes were the cause of the 1975 accident which is the subject of this suit. As noted above, Gilsonite sold the refinery to Gary in December 1975, and therefore had no ownership interest in it for nearly two years preceding this accident.

In addition to alleging that Gilsonite's alterations of the refinery caused the accident, the plaintiffs claim that the original design and construction of the refinery, as well as the operating procedures and processes, also contributed to the accident. It is because of their involvement in the initial design, construction and start-up of the refinery that Socal and CRC are named as defendants.

## II. Socal and CRC Motions for Summary Judgment: Statutes of Limitations.

Socal and CRC assert that because of their lack of involvement with the Mesa Refinery after completion of its construction in 1957, the claims of all plaintiffs against them are barred by section 13–80–127, C.R.S.1973. The plaintiffs have raised questions regarding that section's applicability to the claims they assert, as well as challenges to the statute's constitutionality. Because a different analysis applies to the wrongful death claims of plaintiffs Morris than to the personal injury claims of plaintiffs McClanahan, those two types of claims will be discussed separately.

### A. The Wrongful Death Claims.

█ Plaintiffs Margaret T. Morris, Laura L. Morris and Scott A. Morris, the surviving spouse and children, respectively, of decedent Rex Morris, filed claims under the Colorado wrongful death statute, section 13–21–203, C.R.S.1973. These plaintiffs contend that because theirs is a wrongful death action, the applicable statute of limitations is section 13–21–204, C.R.S.1973, rather than section 13–80–127, C.R.S.1973. I agree.

Section 13–21–204 applies by its terms to "[a]ll actions provided for by sections 13–21–201 to 203 . . . ." On the other hand, the statute upon which the defendants rely applies to "[a]ll actions against any architect, contractor, engineer or inspector brought to recover damages for *injury to persons or property* caused by the design, planning, supervision, inspection, construction, or observance of construction of any improvement to real property . . ." Section 13–80–127, C.R.S.1973.[3] (Emphasis added).

---

3. Section 13–80–127 was amended effective July 1, 1979, in a manner discussed *infra*. The quoted language is the statute as it applies in this case.

The language of section 13–21–204 is plainly all-inclusive, and must be construed to apply to all wrongful death actions in the absence of an express exception in section 13–80–127. Moreover, there is no real conflict between the two provisions, since section 13–80–127 applies only to actions "for injury to person or property," which may reasonably be construed to exclude actions for wrongful death. Finally, the legislature amended section 13–80–127, effective July 1, 1979, to include actions for wrongful death, lending at least some support to the conclusion that wrongful death actions were not previously covered by that statute. Therefore, under the terms of section 13–21–204,[4] the Morrises' claims were required to be brought "within two years from the commission of the alleged negligence resulting in the death for which suit is brought."

▮ Even given the applicability of section 13–21–204 to the Morrises' claims, however, Socal and CRC contend that the plaintiffs failed to join them as defendants in this case prior to the expiration of the two-year period. As related above, the original complaint was filed on November 15, 1977, one day less than two years after the accident, but Socal and CRC were not joined as defendants until February 1978, and September 1978, respectively.

The plaintiffs respond that under F.R. Civ.P. 15(c) they are entitled to have the amendments adding Socal and CRC "relate back" to the date the original complaint was filed. Rule 15(c) provides:

"(c) Relation Back of Amendments. Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against him, the party to be brought in by amendment (1) has received such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him."

The plaintiffs argue that the notice requirement of the Rule has been met because Socal is the parent corporation of and is represented by the same counsel as Chevron U.S.A., an original defendant in the case, and as such received actual notice of the lawsuit almost immediately after the complaint was served on Chevron U.S.A. Moreover, they contend, CRC is also a wholly-owned subsidiary of Socal, and is represented by the same counsel, and thus CRC also had sufficient notice to satisfy Rule 15(c).

If the problem were one of the *fact* of notice alone, the close relationship between these corporations would probably bring this case within the doctrine of *Travelers Indemnity Company v. United States*, 382 F.2d 103 (10th Cir. 1967). That case, however, did not involve the *timing* problems presented here. As the defendants point out, Rule 15(c) requires *notice* to the added party "within the period provided by law for *commencing the action* against him . . . ." (Emphasis added). This language plainly requires notice to have been given within the two-year period provided by section 13–21–204, *i. e.*, before November 16, 1977. The plaintiffs do not assert that either CRC or Socal received notice of this lawsuit before Chevron U.S.A. was served with the complaint on November 21, 1977. Therefore, the relation back doctrine of Rule 15(c) does not apply. *See Janus v. J. M. Barbe Co.*, 57 F.R.D. 539 (N.D.Ohio, E.D. 1972).

▮ The plaintiffs argue, however, that even if the claims cannot relate back, the claims of Scott and Laura Morris, the decedent's children, are still viable because of the tolling period provided by section 13–

---

4. Section 13–21–204 was amended in 1979, as applicable to cases commenced on or after June 7, 1979. The quoted language is from the statute applicable to this case.

81–103, C.R.S.1973. The defendants have not responded to this argument, and it is indeed persuasive.

Section 13–81–103 provides in pertinent part as follows:

"13–81–103. Statute begins to run— when. (1) When in any of the statutes of the state of Colorado a limitation is fixed upon the time within which a right of action, right of redemption, or any other right may be asserted, either affirmatively or by way of defense, or an action, suit or proceeding based thereon may be brought, commenced, maintained, or prosecuted, and the true owner of said right is a person under disability at the time such right accrues, then: (a) If such person under disability is represented by a legal representative at the time the right accrues, or if a legal representative is appointed for such person under disability at any time after the right accrues and prior to the termination of such disability, the applicable statute of limitations shall run against such person under disability in the same manner, for the same period, and with the same effect as it runs against persons not under disability. Such legal representative or his successor in trust, in any event shall be allowed *not less than two years* after his appointment within which to take action on behalf of such person under disability, even though the two-year period expires after the expiration of the period fixed by the applicable statute of limitations; . . ." (Emphasis added).

Minors are "persons under disability" for the purposes of this statute. Section 13–81–101(3), C.R.S.1973.

The language of this general disability statute specifies that it applies to *all* Colorado statutes of limitations, and the Court has found nothing to indicate that it should not apply to wrongful death claims. *See Ball v. Industrial Commission*, 30 Colo.App. 583, 503 P.2d 1040 (1972) (section 13–81–103 applies to statute of limitations for workers' compensation claims). Therefore, section 13–21–204 was tolled as to the minor plaintiffs, Laura and Scott Morris, by the provi-

sions of section 13–81–103. On these motions for summary judgment, there is no evidence as to whether or when Mrs. Morris might have been appointed the children's representative. Absent such evidence the Court must assume for purposes of this motion that this action was timely filed on the children's behalf. This ruling does not foreclose reconsidering this issue in the light of evidence which may be submitted later.

Accordingly, the motions of Socal and CRC for summary judgment are GRANTED as against Margaret T. Morris, and DENIED as against Laura L. and Scott A. Morris.

B. *The Personal Injury Claims.*

Plaintiffs Preston James McClanahan and Marilyn McClanahan seek compensatory damages for personal injuries and loss of consortium. As related above, Socal and CRC contend that these claims are barred by section 13–80–127, C.R.S.1973, and that on the basis of undisputed facts they are entitled to summary judgment. Although by its terms section 13–80–127 does apply to the McClanahans' claims against these two defendants, the statute is unconstitutional. Therefore the governing statute of limitations is section 13–80–110, C.R.S.1973.

1. *Applicability of Section 13–80–127.*

■ In order for the McClanahans' constitutional challenges to section 13–80–127 to be squarely presented, it must first be determined whether that section, if valid, would apply to bar their claims. That section provides in pertinent part as follows:

"All actions against any architect, contractor, engineer, or inspector brought to recover damages for injury to person or property caused by the design, planning, supervision, inspection, construction, or observation of construction of any improvement to real property shall be brought within two years after the claim for relief arises, but in no case shall such an action be brought more than ten years after the substantial completion of the improvements to the real property."

The issues raised by the parties on this point are (a) whether this case involves an

"improvement to real property," and (b) if the answer to the first question is "yes," whether the improvements were "substantially completed" more than ten years before this action was brought.

(a) *"Improvement to real property."*

The plaintiffs argue that the particular structures and equipment at the Mesa Refinery which were involved in the accident in this case were not themselves "improvements to real property" within the meaning of section 13–80–127. In addition, they assert that their claims against Socal and CRC relate to those two entities' involvement in the development of the "processes and procedures" to be used in refining gilsonite, as distinguished from the design and construction of the physical plant of the refinery itself. They contend that this type of involvement removes Socal and CRC from the protection of section 13–80–127.

The Colorado courts have not definitively construed the language of section 13–80–127 to provide guidance as to the meaning of the term "improvement to real property." *Cf. Ciancio v. Serafini,* 40 Colo.App. 168, 574 P.2d 876, 877 (1977) ("[a] survey which is not part of an improvement or building project does not constitute 'an improvement to real property' as that term is used in section 13–80–127, C.R.S.1973 . . . .").

In cases involving similar statutes, however, the courts of other states have generally adopted a "common usage" approach to the construction of this language. For example, in *Kallas Millwork Corporation v. Square D Co.,* 66 Wis.2d 382, 225 N.W.2d 454, 456–57 (1975), the court construed identical language in light of the following definition of "improvement" from Webster's *Third International Dictionary*:

"[A] permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of money or labor and is designed to make the property more useful or valuable as distinguished from ordinary repairs."

Similarly, Black's Law Dictionary (Fifth Ed.) defines an improvement as:

"A valuable addition made to property (usually real estate) or an amelioration of its condition, amounting to more than mere repairs or replacement, costing labor or capital, and intended to enhance its value, beauty, or utility or to adapt it for new of further purposes."

*See also Pacific Indemnity Co. v. Thompson-Yaeger, Inc.,* 260 N.W.2d 548 (Minn. 1977). Since there is no indication in section 13–80–127 or in Colorado case law that any special or technical meaning is intended, the term "improvement" should be construed in its commonly accepted usage.

The refinery structures or equipment here involved were a "delayed coking unit," and its component part, a "surge tank" (also referred to as the "coker feed tank") from which hot oil erupted or overflowed injuring Preston McClanahan and Rex Morris. The question is whether this equipment constituted "improvements" within the special statute of limitations.[5] Therefore it is to the nature of these structures, in the context of their incorporation into the whole refinery, that we must look to determine this issue. From the materials before the Court, it appears that there is no factual dispute as to any matters material to the "improvement to real property" question, and thus that the interpretation of the meaning and legal significance of these words in this case can be decided as a matter of law. *See Kallas Millwork Corporation v. Square D Co., supra.*

When the refinery was originally constructed, a "melt plant" was associated with the delayed coking unit, as a prior step in the refining process. Basically, the melt plant reduced solid gilsonite into a liquid which could then be refined into petroleum products. The liquid then passed from the

---

**5.** Although the Third Amended Complaint alleges that Socal and CRC were involved in the design, planning, construction, installation, inspection and start-up of various other aspects of the refinery as a whole, it is clear that the claims in this case focus on the "delayed coking unit" and the "surge tank" in particular.

melt plant into the coker feed tank, which acted as a surge tank to eliminate downstream fluctuations in the flow. From the surge tank, the liquid continued on to the coking unit where the product was broken down into various components, and the coke was produced.

After the 1973 fire in the melt plant, Gilsonite converted the refinery to process only crude oil. As part of this conversion, the melt plant was taken out of service and crude oil, rather than liquified gilsonite, was run through the surge tank and on to the coking unit.

As the foregoing description indicates, the delayed coking unit and the surge tank were intermediate units in the overall refining process. Thus, realistically, their status as improvements or otherwise cannot be considered apart from their status as parts of the entire refinery—which clearly is an improvement.[6] Even if the surge tank is considered as an entirely separate unit however, it has been described as a "10,000-barrel tank"[7] which simply because of its size had innate characteristics of permanence once it was installed. From this fact, together with the interconnection of the tank with the rest of the refinery by numerous pipes and ducts, it cannot reasonably be concluded that the unit with which we are concerned in this case was anything but an improvement to real property. *See Pacific Indemnity Co. v. Thompson-Yaeger, Inc., supra* (furnace installed in a store was an improvement to real property); *Rosenberg v. Town of North Bergen*, 61 N.J. 190, 293 A.2d 662 (1972) (defective street pavement found to be an improvement to realty); *Yakima Fruit and Cold Storage Co. v. Central Heating and Plumbing Co.*, 81 Wash.2d 528, 503 P.2d 108 (1972) (refrigeration system in cold storage warehouse was an im-

provement to real property); *Kallas Millwork Corp. v. Square D Co., supra* (fire sprinkler system was an improvement to realty).

The plaintiffs argue, however, that even if the refinery and its physical components are improvements to real property, the liability which they seek to impose on Socal and CRC relates to more than just design and construction of physical items. "Defendants Socal and [CRC] were involved primarily in the development of the processes and procedures by which the refinery was to be operated and maintained. In essence, the defendants (CRC) and Socal aided in the creation of a unique product and process for the refining of gilsonite. Neither the product nor the process is an improvement to real property. . . ." Plaintiffs' Memorandum Brief in Opposition, at p. 6.

Although this ingenious argument draws an intriguing distinction, there is nothing before the Court to indicate that either Socal's or CRC's involvement was divorced from the actual design of the refinery. In the Court's view, the design of the "processes" was merely part of the overall project of carrying the designs to a physical reality. That is, it appears from the allegations of the complaint, as well as from affidavits submitted by the defendants, that both CRC and Socal were engaged to help design, construct, and plan and commence operating procedures for this particular refinery. All of their involvement was directed toward and intimately bound up with that ultimate goal. It must be remembered that the language of section 13–80–127 covers certain persons who are involved in the "design, planning, supervision, inspection, construction, or observation of construction of any improvement to real

---

**6.** The plaintiffs rely on *City of Victoria v. Victoria County*, 103 Tex. 477, 129 S.W. 593 (1910), for the proposition that "a structure which is beneficial to a particular use but detrimental to most other uses does not constitute an improvement." That case, which involved a jailhouse, used a definition which does not comport with the "common usage" approach adopted here. More importantly, adoption

here of the limited principle used in that particular case would have the totally unacceptable effect of eliminating innumerable "specialized" structures from the class of "improvement to real property," despite common understanding to the contrary. Therefore the distinction is unpersuasive.

**7.** Deposition of Robert Bowen, at p. 13.

property." Even assuming for these purposes the truth of all of the plaintiffs' allegations, the activities of Socal and CRC fall squarely within that language.

### (b) *"Substantial completion."*

The plaintiffs next argue that even if the refinery is an improvement to real property, it was not "substantially completed" more than ten years before this action was filed and thus section 13–80–127 does not bar their action. The substance of this argument is that although the refinery was completed in its original form in 1957, and Socal and CRC had absolutely no involvement with it after the early 1960's, completion of Gilsonite's alterations to the plant in 1973 should be considered as the point of substantial completion, since the refinery was not in its "final" form until after those alterations.

Such a strained construction of the "substantial completion" requirement would completely ignore the legislative intent behind section 13–80–127. It is more reasonable to conclude that the date of substantial completion—at least insofar as these defendants are concerned—must be the date of completion of the refinery as it was originally built and as Socal and CRC were involved in it. Thus, the date of substantial completion was 1957, and the complaint in this case was filed more than ten years after that date.

### 2. *Constitutionality of Section 13–80–127.*

Given the applicability of section 13–80–127 by its terms, the plaintiffs have raised the following challenges to its constitutionality: (1) that it grants a special privilege or immunity in contravention of Article II, section 11 of the Colorado Constitution; (2) that it violates the equal protection guarantee of the Fourteenth Amendment to the United States Constitution; (3) that it denies their right of access to the courts in derogation of Article II, section 6 of the Colorado Constitution; and (4) that it deprives them of property without due process in violation of both the Fourteenth Amendment to the United States Constitution and Article II, section 3 of the Colorado Constitution. The defendants have raised a serious question of these plaintiffs' standing to raise the equal protection and "special immunities" arguments.

### (a) *Standing.*

■ In this type of case, two distinct standing questions are presented: First, whether the [plaintiffs] allege 'injury in fact,' that is, a sufficiently concrete interest in the outcome of their suit to make it a case or controversy subject to a federal court's Art. III jurisdiction, and second, whether, as a prudential matter, the [plaintiffs] are proper proponents of the particular legal rights on which they base their suit." *Singleton v. Wulff*, 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976).

■ The first question requires little discussion in the circumstances here presented. There can be no doubt that these plaintiffs, who have been grievously injured, stand to lose all rights to relief as against these defendants by the operation of section 13–80–127.

As to the second question here, as in *Singleton,* the issue of what rights these plaintiffs may assert is more difficult. Insofar as they assert their own rights of access to the courts under Colo.Const. Art. II, sec. 6, or to due process under the United States and Colorado Constitutions, they obviously have standing. The plaintiffs' special immunities and equal protection arguments, however, are primarily if not exclusively based on the exclusion of *other potential defendants* in real property improvement cases from the *protection* of section 13–80–127. Thus, the plaintiffs actually seek to assert the rights of others, and it is this attempted assertion of *jus tertii* that the defendants challenge.

In *Singleton v. Wulff, supra,* the Court discussed the reasons for the general rule that ordinarily one may not claim standing to vindicate the constitutional rights of a third party:

"First, the courts should not adjudicate such rights unnecessarily, and it may be that in fact the holders of those rights either do not wish to assert them, or will

be able to enjoy them regardless of whether the in-court litigant is successful or not. . . . Second, third parties themselves usually will be the best proponents of their own rights. The courts depend on effective advocacy, and therefore should prefer to construe legal rights only when the most effective advocates of those rights are before them."

428 U.S. at 113–14, 96 S.Ct. at 2874.

The Court went on, however, to stress that this general rule should not be applied where its underlying justifications are absent, and discussed two factual elements which are important to the determination of whether the rule should apply in a particular case:

"The first is the relationship of the litigant to the person whose right he seeks to assert. If the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue, the court can at least be sure that its construction of the right is not unnecessary in the sense that the right's enjoyment will be unaffected by the outcome of the suit. Furthermore, the relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter. . . . The other factual element to which the Court has looked is the ability of the third party to assert his own right."

*Id.* at 115–16, 96 S.Ct. at 2874–2876.

Considering this case in light of both the rationales and the factual elements discussed above, the Court is satisfied that these plaintiffs are appropriate parties to assert the equal protection and special immunities arguments. Although the plaintiffs challenge the exclusion of certain classes of defendants from the protection of this statute of limitations, the point of their argument is that by this classification they are precluded from asserting *their* own right against the defendants granted preferred status by the statute. Thus, in terms of assuring that the best possible proponents of these rights are before the Court, the intensity of these plaintiffs' interest is clearly as great as that of a material supplier or construction laborer who is excluded from the statute's protection.

As to the question whether the third parties' "enjoyment of the right is inextricably bound up with the activity which the litigant wishes to pursue," this case does not fit precisely into the type of analysis contemplated by *Singleton*, in which physicians sought to assert the rights of their patients to have abortions. The "right" sought to be enjoyed here is the protection of the same statute of limitations as applies to others similarly situated. Although those excluded from the protection of section 13–80–127 might prefer that the statute be *extended* to cover them, the only way of equalizing the protection afforded—at least in the courts—is an attack on the statute's validity. Thus, while there is no close relationship between the plaintiffs and those whose rights they seek to assert, there is adequate assurance that the rights' enjoyment will be affected by the outcome of this suit, and that the result sought by these litigants is the same that would be sought by those excluded from the statute's protection.

Finally, the last factor stressed in *Singleton* is the ability of the third party to assert his or her own rights. Although the Court mentioned that an obstacle to that assertion is an important factor, again the underlying objective is to assure that the party in court is "the right's best available proponent." *Id.* at 116, 96 S.Ct. at 2875. Here, there may be no real obstacles preventing material suppliers or others from challenging this statute themselves in an appropriate case. Nonetheless, the ultimate question is "whether, *as a prudential matter*, the [plaintiffs] are proper proponents of the particular legal rights on which they base their suit." *Id.* at 112, 96 S.Ct. at 2873 (emphasis added). Moreover, the stated rule that one party may not assert the rights of some other person "has not been imposed uniformly as a firm constitutional restriction on federal court jurisdiction." *Flast v. Cohen*, 392 U.S. 83, 99, n. 20, 88 S.Ct. 1942, 1952 n. 20, 20 L.Ed.2d 947 (1968). *See also Barrows v. Jackson*, 346 U.S. 249,

73 S.Ct. 1031, 97 L.Ed. 1586 (1953); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Buchanan v. Warley*, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149 (1917). Because of the very real threat to these plaintiffs from section 13–80–127, which assures the Court that they are truly adversely affected and at least as interested in the arguments presented as would be the persons whose rights they assert, the Court holds that this final factor is not determinative and that the plaintiffs have standing to assert the constitutional challenges above listed.

(b) *Fourteenth Amendment (Equal Protection), and Colo.Const. Art. II, sec. 11 (Art. V, sec. 25).*

Article II, section 11 of the Colorado Constitution prohibits, *inter alia*, "any irrevocable grant of special privileges, franchises or immunities." Although this language might well be construed to encompass the type of "equal protection" or "special legislation" arguments pressed by these plaintiffs, the Colorado courts have not yet so applied it. Rather, challenges like those here involved have generally been raised and decided under Article V, section 25, of the Colorado Constitution, which provides in pertinent part:

"The *general assembly shall not pass* local or *special laws* in any of the following enumerated cases, that is to say  .   .   . *for limitation of civil actions*  .   .   . [or] *granting* to any corporation, association, or individual any *special* or exclusive *privilege, immunity* or franchise *whatsoever.*" (Emphasis added).

Since the substance of the arguments here raised has been considered by the Colorado Supreme Court as addressing Article V, section 25, this Court will consider those arguments as so addressed here.

■ The standards applicable to the plaintiffs' equal protection claims under the Fourteenth Amendment and their special immunities claim under the Colorado Constitution are basically the same. The equal protection clause does not deny a state the power to classify, but only prohibits classification without some reasonable basis. *Mor-*

*ey v. Doud*, 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957). A state legislature has broad discretion in enacting laws which affect some groups of citizens differently than others, and that discretion is abused only if the classification rests on grounds wholly irrelevant to achievement of the state's objective. *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). Where, as here, no suspect classification or fundamental right is involved, the Court's role is to determine whether the classification bears a rational relationship to a legitimate state purpose. *Aubertin v. Board of County Commissioners*, 588 F.2d 781 (10th Cir. 1978). "A statutory discrimination will not be set aside if any set of facts reasonably may be conceived to justify it." *McGowan v. Maryland, supra*, 366 U.S. at 425–26, 81 S.Ct. at 1105.

■ Similarly, under Colo.Const. Art. V, sec. 25, a classification is permissible if it is "based upon substantial differences having a reasonable relation to the objects or persons dealt with and to the public purpose sought to be achieved by the legislation involved." *McCarty v. Goldstein*, 151 Colo. 154, 376 P.2d 691 (1962).

Several state courts have ruled upon similar equal protection and special legislation challenges to statutes substantially identical to section 13–80–127. The following cases have held such statutes invalid in the face of challenges based upon either federal or state constitutions: *Overland Construction Co., Inc. v. Sirmons*, 369 So.2d 572 (Fla.1979); *Fujioka v. Kam*, 55 Haw. 7, 514 P.2d 568 (1973); *Skinner v. Anderson*, 38 Ill.2d 455, 231 N.E.2d 588 (1967); *Muzar v. Metro Townhouses, Inc.*, 82 Mich.App. 368, 266 N.W.2d 850 (1978); *Pacific Indemnity Co. v. Thompson-Yaeger, Inc.*, 260 N.W.2d 548 (Minn.1977); *City of Norman v. Liddell*, 596 P.2d 879 (Okl.1979); *Loyal Order of Moose Lodge 1785 v. Cavaness*, 563 P.2d 143 (Okl.1977); *Broome v. Truluck*, 270 S.C. 227, 241 S.E.2d 739 (1978); *Kallas Millwork Corporation v. Square D Co.*, 66 Wis.2d 382, 225 N.W.2d 454 (1975).

On the other hand, many courts have ruled the other way, upholding this type of

statute. *E. g., Carter v. Hartenstein*, 248 Ark. 1172, 455 S.W.2d 918 (1970), *app. dismissed*, 401 U.S. 901, 91 S.Ct. 868, 27 L.Ed.2d 800 (1971); *Regents of the University of Calif. v. Hartford Accident & Indemn. Co.*, 59 Cal.App.3d 675, 131 Cal.Rptr. 112 (Cal.App.1976); *Reeves v. Ille Elec. Co.*, 551 P.2d 647 (Mont.1976); *Nevada Lakeshore Co. v. Diamond Elec., Inc.*, 89 Nev. 293, 511 P.2d 113 (Nev.1973); *Rosenberg v. Town of North Bergen*, 61 N.J. 190, 293 A.2d 662 (1972); *Howell v. Burk*, 90 N.M. 688, 568 P.2d 214 (App.1977); *Joseph v. Burns*, 260 Or. 493, 491 P.2d 203 (1971); *Freezer Storage, Inc. v. Armstrong Cork Co.*, 234 Pa.Super. 441, 341 A.2d 184 (1975), *aff'd* 476 Pa. 270, 382 A.2d 715 (Pa.1978); *Watts v. Putnam County*, 525 S.W.2d 488 (Tenn.1975); *Hill v. Forrest & Cotton, Inc.*, 555 S.W.2d 145 (Tex.Civ.App.1977); *Good v. Christenson*, 527 P.2d 223 (Utah 1974); *Yakima Fruit & Cold Storage Co. v. Central Heating & Plumbing Co.*, 81 Wash.2d 528, 503 P.2d 108 (1972).

This Court has carefully reviewed those cases and is convinced that the better reasoned position is that taken by those courts which have struck down such statutes because they grant immunity from suit to certain classes of defendants without any reasonable basis for the classification.

It has been argued that the legislature intended this statute to protect those designated classes of persons involved in the construction industry from the greatly increased exposure to liability resulting from, among other things, the abrogation of the rule that contractors and others in construction were not liable to third parties who were injured after a building had been completed and accepted by the owner. Thus, the object of the statute is to require that actions to recover damages caused by defects in construction be filed within a relatively short time following completion of the structure. Primarily, the purpose is to avoid the difficulties in proof which frequently arise from the passage of time.

If this is indeed the purpose of section 13–80–127, then even giving the state legislature the benefit of the doubt, that objective is achieved by this statute in a discriminatory fashion. In order not to extend this opinion any longer than is necessary, it is sufficient to refer to the Illinois Supreme Court's reasoning in *Skinner v. Anderson*, *supra*, which has been relied upon heavily in several later decisions in other states.

"[O]f all those whose negligence in connection with the construction of an improvement to real estate might result in damage to property or injury to persons more than four years after construction is completed, the statute singles out the architect and contractor and grants them immunity. It is not at all inconceivable that the owner or person in control of such an improvement might be held liable for damage or injury that results from a defective condition for which the architect or contractor is in fact responsible. Not only is the owner or person in control given no immunity; the statute takes away his action for indemnity against the architect or contractor.

"The arbitrary quality of the statute clearly appears when we consider that architects and contractors are not the only persons whose negligence in the construction of a building or other improvement may cause damage to property or injury to persons. If, for example, four years after a building is completed a cornice should fall because the adhesive used was defective, the manufacturer of the adhesive used is granted no immunity. And so it is with all others who furnish materials used on constructing the improvement. But if the cornice fell because of defective design or construction, for which an architect or contractor was responsible, immunity is granted. It cannot be said that the one event is more likely than the other to occur within four years after construction is completed." *Skinner v. Anderson*, *supra*, 231 N.E.2d at 591.

The Court's analysis in *Skinner* applies equally here. There is no more reasonable basis for the classification drawn because the period of limitations is ten years rather than the four year period that applied in

Illinois, nor is the classification any more reasonable because the classes granted immunity are more numerous, and include not only architects and contractors but also engineers and inspectors. The defects which the Illinois court found fatal still exist in section 13–80–127, since there are other classes of persons to whom the statute's rationale could apply but who are excluded from its preferential protection. As in *Skinner*, those classes include material suppliers and the owners of the improvements, as well as construction laborers. None of these classes are listed in the statute among those accorded special protection.

This Court has considered the arguments that the decisions of the Colorado Supreme Court in cases involving the special statute of limitations which apply to the medical profession are persuasive evidence that if presented with this question that Court would uphold section 13–80–127. *See McCarty v. Goldstein, supra.* Were the instant statute directed more broadly to the construction industry in general, as well as the owners of improvements, that argument might be more persuasive, for in that case it might reasonably be found that the purposes of such a statute were reasonably related to a legitimate objective, and that no class of persons similarly situated was excluded from the statute's protection. That question is not before the Court at this time, however, and I do not rule on it at this time. Given the statute as it applies to this case, and given the standards which apply under the Fourteenth Amendment and Colo.Const. Art. V, sec. 25, the statute is invalid because it creates a classification which bears no reasonable relation to the objective sought to be achieved.

In accordance with the foregoing analysis, the statute of limitations which applies to the claims of the plaintiffs McClanahan in this case is section 13–80–110, C.R.S.1973 —the statute which normally applies to tort actions. This result is in accord with the more usual and rational classification of limitations statute, *i. e.*, classification based upon the type of liability asserted (negligence, contract, fraud, libel, statutory penalty, etc.) rather than the type of defendant

sued. Moreover this result is more consonant with the fundamental precept of the rule of law that the same law applies to all who are similarly situated and none are accorded special status or immunity in courts of justice. The statute here held unconstitutional offends this concept of the rule of law by raising the suspicion that those who have sufficient political power or who can afford a persuasive lobbyist may achieve immunity from accountability to the laws that govern others. Such a result is intolerable in our justice system.

(c) *Colo.Const. Art. II, sections 3, 6, and Fourteenth Amendment Due Process.*

Given the holding of the plaintiff's equal protection challenges, it is unnecessary to address the other grounds asserted under these sections.

III. *Gilsonite's Motion for Summary Judgment.*

The Third Amended Complaint contains eight claims for relief. The first and second claims allege negligent design, testing, manufacture, installation, inspection, operation and maintenance of the refinery and its component equipment, and negligent concealment and failure to warn of unsafe conditions at the refinery at the time of the sale to Gary Operating Company. The third claim is based on a strict liability theory under Restatement (Second) of Torts § 402A. The fourth and fifth claims are breach of express and implied warranty claims, and the sixth and seventh claims allege that the defendants misrepresented that the refinery's design and condition were safe at the time of the sale, when in fact they were not. Although they do not expressly so state, the fourth through seventh claims must necessarily be directed to Gilsonite, since they focus upon the sale of the refinery rather than the initial design and construction in which Socal and CRC were involved. Finally, the eighth claim alleges fraud or wanton and reckless disregard of the plaintiffs' rights and feelings, and seeks punitive damages on that basis. Gilsonite's motion for summary judgment challenges the availability of re-

lief in this case based on any of these theories.

A. *The Negligence, Concealment, Failure to Warn and Misrepresentation Claims.*

■ Gilsonite first contends that because it conveyed all of its title and interest in the refinery to Gary nearly two years before the accident, as a matter of law it should not be liable for the plaintiffs' injuries. Gilsonite contends that the applicable rule is that "a vendor of real estate is not liable for personal injury to a purchaser or third person caused by a defective condition of the premises existing at the time the purchaser takes possession."

This argument is not persuasive for two reasons. First, those cases relied upon by Gilsonite for its statement of the general rule also recognize two pertinent exceptions to that rule (1) when the vendor actively conceals or fails to reveal to the vendee a defective or dangerous condition, and (2) when the vendor has committed affirmative acts of negligence creating the defective or dangerous condition, as distinguished from mere negligent maintenance of the property. *E. g., Sparling v. Peabody Coal Company*, 59 Ill.2d 491, 322 N.E.2d 5 (1974); *Chapman v. Lily Cache Builders, Inc.*, 48 Ill. App.3d 919, 6 Ill.Dec. 176, 362 N.E.2d 811 (1977); *Firestone v. R. H. Lincoln, Inc.*, 23 Ill.App.3d 320, 319 N.E.2d 60 (1974); *Hut v. Antonio*, 95 N.J.Super. 62, 229 A.2d 823 (1967); *Merrick v. Murphy*, 83 Misc.2d 39, 371 N.Y.S.2d 97 (1975); *Farragher v. City of New York*, 26 A.D.2d 494, 275 N.Y.S.2d 542 (1966). *See generally Annotation*, 48 A.L.R.3d 1027 (1973).

In this case, the first, second, sixth and seventh claims for relief allege facts which bring them within the scope of the above cited exceptions, and the Court is not convinced that the affidavits and other documents submitted by Gilsonite establish that there are no genuine issues as to facts material to these claims. The Court simply cannot accept this defendant's counsel's contention that "it is undisputed that had the operating instructions been followed, there would have been no explosion." Although the evidence may ultimately prove

that assertion to be true, at this point it cannot fairly be said that all other possible causes of the accident have been conclusively ruled out.

Second, under Colorado law the contentions raised by Gilsonite are foreclosed by the decision in *Wright v. Creative Corporation*, 30 Colo.App. 575, 498 P.2d 1179 (1972). In that case, the court stated:

"By applying the *MacPherson* [*MacPherson v. Buick Motor Company*, 217 N.Y. 382, 111 N.E. 1050 (1916)] doctrine to the building of structures or real property, we hold that where the completed work is reasonably certain to endanger third persons if negligently constructed, a contractor or builder of real property is liable for injuries or death of third persons occurring after the completion of the work and after its acceptance by the owner."

498 P.2d at 1181–82.

Here, Gilsonite's role was greater than that of a mere "vendor of real property," because of the structural and design alterations which it carried out after the 1973 fire. Consequently, its liability must also be greater, if negligence in effecting those changes is proven. Although *Wright v. Creative Corporation* involved a residence, and is thus factually distinguishable, there is nothing in that opinion or in any later cases to suggest that the broad language used by the Colorado Court of Appeals should be limited to residence cases.

B. *The Strict Liability Claims.*

■ Gilsonite next contends that the undisputed facts as developed at this point in the case preclude recovery on the strict liability theory pleaded in the third claim for relief.

Colorado has adopted the doctrine of strict liability as defined in Restatement (Second) of Torts § 402A. *Union Supply Company v. Pust*, Colo., 583 P.2d 276 (1978); *Hiigel v. General Motors Corp.*, 190 Colo. 57, 544 P.2d 983 (1975). Section 402A provides:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or his property is subject to liability for physical harm

thereby caused to the ultimate user or consumer, or to his property if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold."

There are several problems with the plaintiffs' attempt to pursue their claims on a strict liability theory based on § 402A. First, the plaintiffs have cited no persuasive authority for their proposition that the refinery is a "product" within the meaning of § 402A. Admittedly, cases have held that certain fixtures or attachments to real property were "products" for strict liability purposes. *See, e. g., Schipper v. Levitt & Sons, Inc.,* 44 N.J. 70, 207 A.2d 314 (1965). Here, however, the plaintiffs have not focused on any particular item or component which can be considered a separate "product" apart from the entire, integrated refinery.

Second, even assuming the existence of a "product," the Court is convinced that Gilsonite, when it sold the refinery, was not "engaged in the business of selling such a product," as required by § 402A. There is no contention that Gilsonite's sale of the Mesa Refinery was anything more than a one-time, isolated conveyance of a unique gilsonite refinery that had been converted for use as a crude oil refinery. The plaintiff has cited no authority in support of its argument that this constituted the business of selling such a product, and the Court is aware of none.

Third, and most importantly since this Court is bound to apply Colorado law in this case, the Colorado Court of Appeals in *Wright v. Creative Corporation, supra,* has limited the application of strict liability to the exclusion of the instant case. In *Wright,* the Court considered whether strict liability should apply to a claim of defective residential construction, stating as follows:

"An investigation of the purpose of imposing a strict liability rule based on an enterprise liability theory has convinced us that such a rule should not be applied in the present case. . . . Justice

Traynor in *Greenman v. Yuba Power Products, Inc.,* 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897, concisely stated the reasoning behind this theory of strict liability:

'The purpose of such [strict] liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves. Sales warranties serve this purpose fitfully at best.'

"As this passage indicates, the predominant problem with effectuating recovery for injuries caused by a chattel is the difficulty of finding the negligent party and effecting a recovery from that party. . . . There are important differences between strict liability as applied to manufactured products and as applied to building construction situations. A builder cannot easily limit his liability by express warranties and disclaimers, and it is easier to trace a defect to a builder than to a manufacturer as there is more opportunity to make a meaningful inspection of a structure on real property."

498 P.2d at 1182–83. Although *Wright* did not hold that strict liability could *never* apply in a case involving improvements to real property, the Court's reasoning applies equally to this case and thus is dispositive. The purposes of strict liability are simply not served in a case involving an isolated sale from one corporation to another of a single, unique structure, especially where, as here, it is undisputed that the purchaser, Gary, had hired an independent engineer to inspect the refinery and give his opinion on its soundness. Therefore the plaintiffs will not be permitted to go forward on their strict liability theory.

### C. *The Breach of Warranty Claims.*

█ Gilsonite next contends that there is no factual basis for the plaintiffs' fourth and fifth claims for relief, which are founded on alleged breaches of express and implied warranties.

The plaintiffs' warranty theories are based on the sales provisions of Article 2 of the Uniform Commercial Code as adopted in Colorado, sections 4–2–201, et seq., C.R.S. 1973 (1979 Cum.Supp.). That article applies only to transactions in "goods." Section 4–2–102. "Goods" are defined as "all things (including specially manufactured goods) which are movable at the time of identification to the sale," including "things attached to realty (section 4–2–107)." Section 4–2–105. Section 4–2–107 in turn provides that a "contract for the sale of minerals or the like (including oil and gas) or a structure or its materials to be removed from realty is a contract for the sale of goods within this article if they are to be severed by the seller . . . ."

Applying these definitions to this case, it is clear that the refinery sale from Gilsonite to Gary did not involve the sale of "goods" and thus was not covered by Article 2 of the U.S.C. Even assuming severability and movability of the various refinery components, severance was not contemplated by the parties to the sale contract. *See Gallegos v. Graff*, 32 Colo.App. 213, 508 P.2d 798 (1973).

### IV. *Conclusion.*

Finally, it should be noted that the foregoing analysis with respect to the plaintiffs' substantive claims against Gilsonite applies equally to those claims as they are asserted against Socal and CRC—although as a practical matter it is clear that the breach of warranty and misrepresentation claims, which focus on the sale from Gilsonite to Gary, are not directed at Socal and CRC. At oral argument, Socal and CRC indicated that they joined in Gilsonite's motion. Accordingly, the rulings contained in part II of this opinion will apply to all defendants, and it is

ORDERED that Socal's and CRC's motions for summary judgment based on the statute of limitations are GRANTED as against plaintiff Margaret T. Morris and DENIED as against all remaining plaintiffs, and that Gilsonite's motion for summary judgment, as joined by Socal and CRC, is GRANTED as to the third, fourth,

and fifth claims for relief, and DENIED as to the remaining claims.