MOMINEE ET AL., APPELLEES, *v.* SCHERBARTH ET AL., APPELLANTS.
GREGORY ET AL., APPELLEES, *v.* ARMSTRONG ET AL., APPELLANTS.
JORDAN ET AL., APPELLEES, *v.* MAUMEE VALLEY HOSPITAL
ET AL., APPELLANTS.
WAINSTEIN, APPELLANT, *v.* UNIVERSITY HOSPITALS OF CLEVELAND
ET AL., APPELLEES.

[Cite as Mominee *v.* Scherbarth (1986), 28 Ohio St. 3d 270.]

(Nos. 85-688 and 85-1039—Decided December 22, 1986.)

Case No. 85-688
*Frank W. Cubbon, Jr. & Associates Co., L.P.A.,* and *Frank W. Cubbon, Jr.,* for appellees Paul C. Mominee, Jr. et al.

*Manahan, Pietrykowski & Bamman* and *H. William Bamman,* for appellant R.E. Scherbarth, M.D.

*Shumaker, Loop & Kendrick, Robert G. Clayton, Jr.* and *H. Frank McDaniel, Jr.,* for appellant Margaret B. Miller, M.D.

*Robison, Curphey & O'Connell* and *E. Thomas Maguire,* for appellant Flower Hospital.

*Frank W. Cubbon, Jr. & Associates Co., L.P.A.,* and *Thomas W. Gallagher,* for appellees Maurice D. Gregory et al.

*Robison, Curphey & O'Connell, E. Thomas Maguire* and *James R. Brazeau,* for appellant Carl L. Armstrong, M.D.

*Shumaker, Loop & Kendrick, Robert G. Clayton, Jr.* and *H. Frank McDaniel, Jr.,* for appellant Toledo Hospital.

*Frank W. Cubbon, Jr. & Associates Co., L.P.A.,* and *Guy T. Barone,* for appellees Bliss Jordan, Jr. et al.

*Anthony G. Pizza,* prosecuting attorney, and *Jeffrey B. Johnston,* for appellants Maumee Valley Hospital and Lucas County Commrs.

*Manahan, Pietrykowski & Bamman* and *Thomas J. Manahan,* for appellant Enrico T. Farinas, Jr., M.D.

*Jones, Schell & Schaefer, Willis P. Jones, Jr.* and *Sandra E. Plunkett,* for appellant S.S. Purewal, M.D.

*Michael F. Lyon,* urging affirmance for *amicus curiae,* Ohio Academy of Trial Lawyers.

*Nukes & Perantinides Co., L.P.A., Paul G. Perantinides, Elizabeth B. Manning* and *Linda Tucci Teodosio,* urging affirmance for *amici curiae,* Michael G. Finegan and Douglas Unrue, minors.

*Bricker & Eckler, James J. Hughes, Jr.* and *Elizabeth A. Squeglia,* urging reversal for *amicus curiae,* Ohio Hospital Association.

*Porter, Wright, Morris & Arthur, James E. Pohlman, William M. Todd* and *Kathy N. Seward,* urging reversal for *amicus curiae,* Ohio State Medical Assn.

Case No. 85-1039

*Spangenberg, Shibley, Traci & Lancione, John G. Lancione* and *Paige A. Martin,* for appellant.

*Reminger & Reminger Co., L.P.A,* and *Gary H. Goldwasser,* for appellee University Hospitals of Cleveland.

*Rhoa, Follen, Rawlin & Johnson Co., L.P.A., Albert J. Rhoa* and *W. Andrew Hoffman III,* for appellee Marvin L. Whitman, M.D.

SWEENEY, J. The single issue raised in this consolidated cause is whether R.C. 2305.11(B), as applied to minors, violates the due process or due course of law provisions of the Ohio Constitution.

Given the important considerations involved in these controversies, a brief history of the various challenges to R.C. 2305.11 is essential to the resolution of the cause *sub judice.*

Prior to the effective date of the amended statute in issue (July 28,

1975), R.C. 2305.11 provided that a person had one year from the date the cause of action accrued to file suit for medical malpractice. However, this limitations period was tolled pursuant to R.C. 2305.16, the "disabilities" statute, for minors until they attained the age of majority. Thus, injured minors whose causes of action accrued before they reached the age of majority had until their nineteenth birthday to commence a malpractice action.

R.C. 2305.11 was amended in 1975 by Am. Sub. H.B. No. 682 (136 Ohio Laws, Part II, 2809, 2810-2811). Under the amended statute there exists in addition to the one-year limitations period, an absolute limit of four years in which an individual can bring an action alleging medical malpractice. Thus, under the 1975 statutory amendment, an individual with a claim for medical malpractice is required to commence suit within one year from the date the cause of action accrued, or four years from the date the alleged malpractice occurred, whichever comes first. In addition, and of particular importance to the instant cause, the amendment specifically excepted R.C. 2305.11 from the "disabilities" tolling statute provided in R.C. 2305.16. Under the amended version of R.C. 2305.11(B), only minors under the age of ten had their limitations period tolled, but only until they reached their fourteenth birthday, by which time they had to file their claim.

Subsequent to the General Assembly's amendment to the instant malpractice statute of limitations, this court has been presented with a number of various challenges to R.C. 2305.11(B) as it applies to minors.

In *Vance* v. *St. Vincent Hospital* (1980), 64 Ohio St. 2d 36 [18 O.O.3d 216], we were first asked to interpret the new statutory language. The question presented in *Vance* was whether the abrogation of the tolling provision, division (B) of R.C. 2305.11, applied only to the absolute four-year limitation, or whether it also applied to the one-year limitations period set forth in division (A). After examining the language of Am. Sub. H.B. No. 682, in light of the circumstances surrounding its passage, this court concluded that the challenged language applied to the entire statute, and not merely to division (B). However, in *Vance*, we specifically refrained from determining the constitutionality of the provision abrogating the "disabilities" tolling statute, since the same was not raised as an issue therein.

The first opportunity this court was presented with a challenge to the constitutionality of R.C. 2305.11(B) occurred in *Schwan* v. *Riverside Methodist Hospital* (1983), 6 Ohio St. 3d 300. In *Schwan,* the statutory distinction between children ten years of age and older, who had no tolling period, and those under ten, who did have a grace period, was questioned on equal protection grounds pursuant to Section 2, Article I of the Ohio Constitution. In applying the pertinent test for equal protection, we determined that the final clause of R.C. 2305.11(B) failed the "rational basis" test, and was therefore unconstitutional.

Our holding in *Schwan,* together with our decision in *Opalko* v. *Marymount Hospital, Inc.* (1984), 9 Ohio St. 3d 63, abrogated any and all irrational and unconstitutional classifications of minors within their own class. Hence, in light of equal protection analysis, the effect of our decisions in both *Schwan* and *Opalko* was that minors and adults are subject to the same time limitations set forth in divisions (A) and (B) of R.C. 2305.11. Nevertheless, neither *Schwan* nor *Opalko* raised or determined the constitutionality of R.C. 2305.11(B) in the context of due process or due course of law.

In the causes consolidated *sub judice,* we are asked to review the constitutionality of R.C. 2305.11(B) as it relates to minors in light of due process considerations.

Section 1, Article I of the Ohio Constitution provides:

"All men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety."

Section 16, Article I, states in relevant part:

"All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay."

In testing the constitutionality of a legislative enactment, we begin with the common ground that all such enactments enjoy a presumption of constitutional validity. *Schwan, supra,* at 301; *Benevolent Assn.* v. *Parma* (1980), 61 Ohio St. 2d 375, 377 [15 O.O.3d 450]; *State, ex rel. Taft,* v. *Campanella* (1977), 50 Ohio St. 2d 242, 246 [4 O.O.3d 423]; *State, ex rel. Dickman,* v. *Defenbacher* (1955), 164 Ohio St. 142 [57 O.O. 134], paragraph one of the syllabus.

A legislative enactment will be deemed valid on due process grounds "* * * [1] if it bears a real and substantial relation to the public health, safety, morals or general welfare of the public and [2] if it is not unreasonable or arbitrary." *Benjamin* v. *Columbus* (1957), 167 Ohio St. 103 [4 O.O.2d 113], paragraph five of the syllabus. See, also, *Downing* v. *Cook* (1982), 69 Ohio St. 2d 149 [23 O.O.3d 186]; and *DeMoise* v. *Dowell* (1984), 10 Ohio St. 3d 92.

R.C. 2305.11(B) was enacted in a legislative "response to what was largely perceived throughout the country to be a medical malpractice 'crisis' manifested by sharply increased medical malpractice insurance premiums, cancellation of policies, and physician work slowdowns or stoppages." (Footnotes omitted.) *Vance, supra,* at 40. The General Assembly declared R.C. 2305.11(B) "to be 'an emergency measure necessary for the immediate preservation of the public peace, health, and safety' due to 'the fact that immediate action is necessary to insure a continuance of health care delivery to the citizens of Ohio.'" *Id.* (quoting Am. Sub. H.B. No. 682, at Section 8). Thus, the ultimate goal of the legislature was to insure

the provision of health care to Ohio citizens. The means to that goal was comprehensive legislation designed to reduce medical malpractice insurance premiums. See Am. Sub. H.B. No. 682, at Section 5. In addition, defendants urge that a second goal of the statute is to prevent stale claims. This aim is naturally the purpose of any statute of limitations.

While we believe that the goals of R.C. 2305.11(B) are proper, the first question we must consider is whether there is a real and substantial relationship between those goals and R.C. 2305.11(B) as applied to minors.

In order to monitor the effectiveness of the new legislation, the General Assembly required the Superintendent of Insurance to report annually on whether the 1975 amendments that were designed to reduce insurance premiums were actually having that effect. "R.C. 2305.11(B), however, was not of sufficient consequence to be included among those provisions for annual review." *Schwan, supra,* at 302-303; see Am. Sub. H.B. No. 682, at Section 5. Moreover, defendants have failed to proffer any evidence that R.C. 2305.11(B) as applied to minors has had any effect on insurance premiums; nor have they provided us with evidence that minors with malpractice claims even constitute a significant portion of all medical malpractice claimants. How important, therefore, can this section be to the immediate goal of reducing insurance premiums? Certainly, in our view, the relationship between the statute and the goal is not substantial.

The second inquiry to be reviewed is whether R.C. 2305.11(B) is unreasonable or arbitrary as applied to minors. The Ohio due process or due course of law provisions require that all courts be open to every person who is injured. Section 16, Article I, Ohio Constitution. Yet, we believe that upholding R.C. 2305.11(B) against minors effectively closes the courthouse doors to them. It is beyond dispute that a minor has no standing to sue before he or she reaches the age of majority. Civ. R. 17(B). However, given the abrogation of the "disabilities" tolling statute in R.C. 2305.11(B), minors may, as in the cause *sub judice,* lose their rights to redress before they reach eighteen years of age. Thus, the sum and substance of R.C. 2305.11(B) is that a minor shall have no standing to sue before attaining the age of majority, and no right to bring suit thereafter. Such, in our view, is totally unreasonable and patently arbitrary.

The usual response to this conclusion is that a minor's parent or guardian may sue for, and on behalf of, the child. We find such a suggestion to be troublesome for several reasons. First, because of the inability of many children to recognize or articulate physical problems, parents may be unaware that medical malpractice has occurred. Second, the parents themselves may be minors, ignorant, lethargic, or lack the requisite concern to bring a malpractice action within the time provided by statute. See *Sax* v. *Votteler* (Tex. 1983), 648 S. W. 2d 661, 667. Third, there may effectively be no parent or guardian, concerned or otherwise, in the minor's life. For example, children in institutions, foster homes, and wards of

court or others are provided no safeguards, nor do such minors have the requisite ability to seek redress or to protect personal interests.

The Eighth Appellate District asserted in its opinion in *Wainstein v. University Hospitals, supra,* that the courthouse doors were not unreasonably closed to minors under R.C. 2305.11(B). The appellate court reasoned that, because parental immunity has been abolished, see *Kirchner v. Crystal* (1984), 15 Ohio St. 3d 326, children may bring an action against their parents for failing to file a malpractice claim for them. We reject this conclusion for several reasons.

First, we find it unrealistic to expect that children would seek legal redress against their parents as willingly as against the parties who are alleged to be medically negligent. Placing young adults in a dilemma in which they must choose between suing their parents or abandoning their claims has the practical effect of chilling their due process rights.

Second, assuming *arguendo* that an eighteen year old would be inclined to commence a lawsuit against his or her parents for negligent failure to file a timely medical malpractice action, the same evidentiary concerns remain that are concomitant with a malpractice suit. A claim for parental negligence in this context would necessitate proof that there was merit to the underlying claim of medical malpractice. Thus, under such circumstances, litigation of the purportedly stale claims would still be required. As a result, R.C. 2305.11(B) would not advance its ostensible goal of preventing stale claims.

Finally, if parents are faced with the prospect of a possible lawsuit for failure to file a timely malpractice claim, they may feel obligated to commence an action on behalf of the child in order to preserve a purely speculative claim, regardless of its merit. Even if no lawsuit is filed, since a parent is placed in the position of protector for a child's possible lawsuit, the physician-parent relationship takes on an adversarial nature ill-suited to optimal health care for the child. As we have noted previously, mutual confidence is essential to the physician-patient relationship. See *Oliver v. Kaiser Community Health Found.* (1983), 5 Ohio St. 3d 111, 112-113. Thus, the ultimate goal of R.C. 2305.11(B), the advancement of health care to Ohioans, would be frustrated.

Based on all the foregoing, we hold that R.C. 2305.11(B) is unconstitutional as applied to minors under the due course of law provisions of the Ohio Constitution.[4]

Our holding in this regard is not a novel one. The Texas Supreme Court found a similar statutory scheme to be violative of its state Constitu-

---

[4] One of the dissenting opinions herein cites several journal articles and sets of statistics which seemingly purport to underscore the wisdom of the instant malpractice statute as a vehicle to eliminate problems of stale claims and long-tail liability. However, as this same dissenting opinion observes, the wisdom of a particular legislative enactment should and must have no bearing on issues concerning the constitutionality of that statute.

tion in *Sax, supra.* Recently, the Missouri Supreme Court struck down, on due process grounds, its state's malpractice statute of limitations as applied to minors in *Strahler* v. *St. Luke's Hospital* (Mo. en banc 1986), 706 S. W. 2d 7.[5]

Like the court in *Strahler,* at 10, we are particularly persuaded by the succinct writings of a commentator in the Journal of Legal Medicine:

"State legislatures reacted in the 1970's to a perceived crisis in medical malpractice insurance by enacting these types of limitations provisions. While such provisions no doubt go some distance in alleviating the problems of malpractice insurers and health care providers, they do so only at a high cost. Their effect is to bar the malpractice suits of minors without regard to the validity of their claims or the fact that the minors are wholly innocent in failing to timely pursue their claims. Such a result seems to unfairly penalize the blameless minor in order to protect the potentially negligent health care provider." Andrews, Infant Tolling Statutes in Medical Malpractice Cases: State Constitutional Challenges (1984), 5 J. Legal Med. 469.

While the General Assembly is empowered to respond to circumstances or perceived crises that demand legislative initiative, legislation must comport with the rights and guarantees established in the Ohio Constitution. We believe that R.C. 2305.11(B) as applied to minors does not withstand constitutional scrutiny, and must therefore be held constitutionally infirm.[6] The practical effect of our holding will restore the "disabilities" tolling statute, R.C. 2305.16, for minors with malpractice claims. Minors whose causes of action accrued before their majority have until their nineteenth birthday to commence suit. Minors who have not discovered the alleged malpractice by their eighteenth birthday have one year from the date of discovery of the malpractice or their twenty-second birthday, whichever comes first, to commence an action. See *Oliver, supra.*

In light of our holding today, we must reexamine our decision in *Baird* v. *Loeffler* (1982), 69 Ohio St. 2d 533 [23 O.O.3d 458]. In *Baird,* we were asked to determine whether R.C. 2305.11(B) could be applied retroactively. The resolution of that inquiry hinged on our interpretation of Sec-

---

[5] Our research indicates that two other jurisdictions have also held their respective state medical malpractice limitations statute unconstitutional as applied to minors: *Carson* v. *Maurer* (1980), 120 N.H. 925, 424 A. 2d 825 (statute held to be violative of equal protection); *Barrio* v. *San Manuel Division Hosp.* (1984), 143 Ariz. 101, 692 P. 2d 280 (statute held to be unconstitutional under Arizona's state constitutional guarantee against abolition of the fundamental right to recover damages by way of a common-law action).

[6] We express no opinion as to the constitutionality of R.C. 2305.11(B) in the due process context as applied to adults, since such issue was not raised in the cause *sub judice.*

tion 28, Article II of the Ohio Constitution,[7] which governs retroactive legislation. The problem with a new, shorter statute of limitations is that, if applied retroactively, it may destroy a cause of action that has already accrued. To prevent constitutional infirmity under Section 28, Article II, we have developed the rule that "* * * application of an amended statute [of limitations] is not unlawful as long as a prospective claimant is still afforded a reasonable time in which to enforce his right." *Id.* at 535. Such a rule is still good law. However, to the extent that our decision in *Baird* holds that it is reasonable to require minors to sue for medical malpractice before they have reached their majority, it is overruled. While one year from the effective date of a new statute of limitations may be a reasonable time in which to require a claimant to bring suit for the purposes of Section 28, Article II, we believe that such a limitation cannot be applied to minors without violating Sections 1 and 16 of Article I of the Ohio Constitution.

Accordingly, the judgment of the Court of Appeals for Lucas County is affirmed, and the judgment of the Court of Appeals for Cuyahoga County is reversed. Each of the consolidated cases is remanded to its respective trial court for further proceedings in accordance with this opinion.

*Judgment affirmed in case No. 85-688.*
*Judgment reversed in case No. 85-1039.*

CELEBREZZE, C.J., and LOCHER, J., concur.

C. BROWN and DOUGLAS, JJ., concur in the syllabus and judgment.

HOLMES and WRIGHT, JJ., dissent.

CELEBREZZE, C.J., concurring. The legal analysis of the constitutionality of R.C. 2305.11(B), as applied to minors, is compellingly presented in Justice Sweeney's majority opinion. As Justice Sweeney has demonstrated, the statutory four-year time bar, when applied to minors injured by medical malpractice, does not bear a real and substantial relation to the legislative goal of providing access to health care for the citizens of this state. It is also manifest that this time bar is an unreasonable and arbitrary restriction on minors' access to our courts. The crux of this legal

---

[7] Section 28, Article II of the Ohio Constitution provides:

"The general assembly shall have no power to pass retroactive laws, or laws impairing the obligation of contracts; but may, by general laws, authorize courts to carry into effect, upon such terms as shall be just and equitable, the manifest intention of parties, and officers, by curing omissions, defects, and errors, in instruments and proceedings, arising out of their want of conformity with the laws of this state."

analysis was eloquently stated in *Strahler* v. *St. Luke's Hospital* (Mo. en banc 1986), 706 S.W. 2d 7, 11, where, in striking down that state's two-year statute of repose as to minors, the Missouri Supreme Court explained, "the method employed by the legislature to battle any escalating economic and social costs connected with medical malpractice litigation exacts far too high a price from minor plaintiffs * * *."

I write separately to address the contention of the medical profession that the striking of R.C. 2305.11(B) as to minors could jeopardize the delivery of health care to Ohioans.[8]

The four-year time limitation on malpractice actions involving minors was one part of a legislative design to reduce malpractice insurance premiums and thus assure the continued availability of health care. Yet, as the majority opinion clearly points out, this restriction on minors has apparently had no consequential effect on premiums.

---

[8] During this 1986 term of the Supreme Court of Ohio, members of the court have repeatedly demonstrated their propensity for substituting their views of what this state's laws should be for those of the General Assembly. This capricious rewriting of Ohio's statutes and dilution of this state's constitutional guarantees has been ill-advised and often dangerous. By way of example only, consider the changes wrought to our state tax laws by *OAMCO* v. *Lindley [II]* (1986), 27 Ohio St. 3d 7, and *OAMCO* v. *Lindley [I]* (1986), 24 Ohio St. 3d 124; the damage inflicted on the principle of statewide liquor control, *Ridgley* v. *Wadsworth Bd. of Zoning Appeals* (1986), 28 Ohio St. 3d 357; the wholesale rewriting of workers' compensation laws exemplified by *State ex rel., Elliott,* v. *Indus. Comm.* (1986), 26 Ohio St. 3d 76, *State, ex rel. Milburn,* v. *Indus. Comm.* (1986), 26 Ohio St. 3d 119, *State, ex rel. Hughes,* v. *Goodyear Tire & Rubber Co.* (1986), 26 Ohio St. 3d 71, *State, ex rel. Smith,* v. *Indus. Comm.* (1986), 26 Ohio St. 3d 128, *State, ex rel. Rouch,* v. *Eagle Tool & Machine Co.* (1986), 26 Ohio St. 3d 197, *Phelps* v. *Positive Action Tool Co.* (1986), 26 Ohio St. 3d 142; the undermining of the important statutory protection against uninsured motorists, *Hedrick* v. *Motorists Mut. Ins. Co.* (1986), 22 Ohio St. 3d 42; and the emasculation of the right to be free from unreasonable searches and seizures guaranteed by Section 14, Article I of the Ohio Constitution, *State* v. *Halczyszak* (1986), 25 Ohio St. 3d 301.

Some may suggest that the decision in the instant case again involves an unwarranted exercise in judicial legislation. Such an assertion reflects a basic misunderstanding of this court's task when confronted with a direct challenge to the constitutionality of legislation. Our role in these cases is not to rewrite statutes to our liking — it is to determine whether the legislation conforms to the mandates of our Constitution:

"It is a fundamental principle that the determination of the propriety, wisdom, policy or expediency of legislation is not within the judicial function and laws may not be declared invalid by the courts because deemed inexpedient or unwise, nor may laws be thus nullified upon the ground that their enactment was prompted by improper motives.

"*The duty of courts in such regard is to determine whether the action of the General Assembly is within its constitutional authority, and the court intervenes only when the legislative act is clearly incompatible with some express provision of the Constitution.*" (Emphasis added). *State* v. *Parker* (1948), 150 Ohio St. 22, 24 [37 O.O. 318].

As is our duty, in the instant case we have objectively examined R.C. 2305.11(B) and determined that the statute is incompatible with the due course of law provisions of the Ohio Constitution. It is regrettable that some have been all too willing this term to substitute their judgment for that of the General Assembly when they are in a majority, but now characterize today's just decision as judicial legislation. Perhaps, like the boy who cried wolf, their cries of alarm will be recognized as false.

Further, the assurance of the availability of health care in Ohio is an institutional problem of sweeping dimension that will not be solved merely by reducing medical malpractice insurance premiums. As one scholarly article explains, "[p]remiums seem to be less of a financial burden when compared to total health care spending. * * * Even after the rapid growth in premiums during the mid-1970's, malpractice insurance costs seem to be about one percent of total health care spending since 1976." Bovbjerg, Koller & Zuckerman, Information on Malpractice: A Review of Empirical Research on Major Policy Issues (Spring 1986), 49 Law and Contemp. Probs. 85, 93 (hereinafter "Empirical Research").

Although the medical profession and its insurers insist that a new crisis in the affordability of malpractice insurance is upon us, a more dispassionate analyst of this assertion has recently observed that "whether insurance is in fact unaffordable remains to be demonstrated. It is noteworthy that despite the continued increase in premium costs, the ratio of such costs to average provider income has not changed substantially. The AMA's [American Medical Association's] own surveys show that average premium costs as a percentage of physician's gross income were about 3.7% in 1983, down from 4.4% in 1976 and about the same as in 1979." Robinson, The Medical Malpractice Crisis of the 1970's: A Retrospective (Spring 1986), 49 Law and Contemp. Probs. 5, 31.

Health care providers also claim that judicial erosion of the legislated malpractice reforms has hurt consumers by forcing physicians to practice costly defensive medicine. Although this contention may have some factual basis, noted authorities have found it to be overstated.

"* * * In 1985 the American Medical Association estimated that the annual cost of defensive medicine now exceeds $15 billion. Even in the context of an annual health care budget that exceeds $375 billion, a cost of $15 billion for unproductive medical practices would be reason for grave concern. It would be, that is, if there were good reason to believe that costs of such magnitude are being incurred.

"In fact, evidence of defensive medicine is notoriously unreliable. The AMA's estimate was based on the most casual empirical technique— soliciting physicians' subjective opinions through an AMA survey. The basis for those opinions in this particular survey is not revealed; however, if earlier reports of defensive medicine by health care providers are representative of the rationale underlying those opinions, one must be deeply skeptical." Robinson, Rethinking the Allocation of Medical Malpractice Risks Between Patients and Providers (Spring 1986), 49 Law and Contemp. Probs. 173, 177. See, also, Empirical Research, *supra,* at 108-109.

Finally, the medical profession decries the "long-tail" liability which may result from striking the statute of repose as to minors, and claims that this will increase the cost of malpractice insurance. Yet the cyclical nature of the insurance industry itself also contributes to the increase in

malpractice insurance premiums. One fifteen-year study concludes as follows:

"The insurance industry's natural behavior contributes to the continuing cycles of 'crisis' and 'remission.' The high investment yields of the early 1980's and the influx of new carriers led to continued price cutting (below actuarially appropriate levels) through 1983. In 1984, the strong dollar reduced the amount of insurance and reinsurance capacity available from sources outside the United States (notably London), and emerging losses in the United States finally forced companies to raise premiums." Posner, Trends in Medical Malpractice Insurance 1970-1985 (Spring 1986), 49 Law and Contemp. Probs. 37, 48.

Indeed, the cyclical nature of the cost of malpractice insurance was recently confirmed in the public remarks of an official of the largest hospital insurer in Ohio. Richard P. Fogo, president of the Ohio Hospital Insurance Company, commented that the General Assembly may not be able to prevent "periodic crises" in the affordability or availability of liability insurance. Fogo is quoted by the press as saying, "[y]es, we're probably going to go through this every 10 (ten) years."[9]

In summary, R.C. 2305.11(B), as applied to minors, has had no documented effect on medical malpractice insurance premiums in this state. Thus, the statutory four-year bar for minors has not been shown to have a real and substantial relation to the goal of assuring continued access to health care. Although we cannot ignore the concerns perceived by the medical profession, they offer little conclusive evidence that malpractice insurance premiums have become or will become so unaffordable as to threaten the availability of health care and health care providers. Moreover, the application of R.C. 2305.11(B) to minors injured by medical malpractice is both arbitrary and unreasonable, for the detriment imposed on minors by the four-year bar far outweighs any incremental benefits which may accrue to doctors, hospitals and insurers. Like my brothers in the majority, I do not believe that access to health care need come at the cost of a minor's access to redress in the courts. For the foregoing reasons, I respectfully concur.

CLIFFORD F. BROWN, J., concurring. I concur in the sound analysis and just result reached by the majority opinion as far as it goes. However, I believe the majority opinion does not go far enough because it should also declare R.C. 2305.11(B) unconstitutional as applied to adults as well as to minors. Furthermore, I concur in Parts II, III, IV, and V of Justice Douglas' concurring opinion.

Part II of the concurring opinion of Justice Douglas presents the same accurate reading of *Schwan* v. *Riverside Methodist Hospital* (1983), 6 Ohio St. 3d 300, that I have previously expounded in my dissent in *Opalko* v.

---

[9] Columbus Dispatch (May 13, 1986), at 5B, col. 4.

*Marymount Hospital, Inc.* (1984), 9 Ohio St. 3d 63, 65-66 (Clifford F. Brown, J., dissenting). My dissent in *Opalko, supra,* at 66 through 68, further discussed the impact of the open court provision, Section 16, Article I of the Ohio Constitution,[10] on R.C. 2305.11(B) as applied to minors. Parts III and IV of Justice Douglas' concurrence represent a logical extension of that provision to adults as well as minors within the contemplation of R.C. 2305.11(B). Therefore, I endorse Parts III and IV of Justice Douglas' concurrence.[11]

I feel compelled to add, however, that I believe that the due course of law provision of the Ohio Constitution[12] is not completely separate from the open court provision of Section 16, Article I. A statute which violates the open court provision of Section 16, Article I of the Ohio Constitution is also in violation *per se* of the due course of law provision of Section 1, Article I of the Ohio Constitution.

Finally, I add that although declaring R.C. 2305.11(B) unconstitutional as violative of the Ohio Constitution is sufficient to eliminate it from Ohio jurisprudence, a further reason for this result is that R.C. 2305.11(B) is violative of the Due Process and Equal Protection Clauses of the United States Constitution as well.

Section 1 of the Fourteenth Amendment to the United States Constitution reads in pertinent part:

"* * * No state shall * * * deprive any person of life, liberty, or prop-

---

[10] Section 16, Article I of the Ohio Constitution referred to as the "open court" provision reads in pertinent part:

"All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay."

[11] Other jurisdictions have construed their relevant "open court" provisions to forbid a similar type of absolute bar as is found in R.C. 2305.11(B). See, *e.g., Strahler* v. *St. Luke's Hosp.* (Mo. en banc 1986), 706 S.W. 2d 7 (applied to minors); *Barrio* v. *San Manuel Division Hosp.* (1984), 143 Ariz. 101, 692 P. 2d 280 (applied to minors); *Neagle* v. *Nelson* (Tex. 1985), 685 S.W. 2d 11, 12 ("[t]he open courts provision of our Constitution protects a citizen, such as * * * [the adult plaintiff], from legislative acts that abridge his right to sue before he has a reasonable opportunity to discover the wrong and bring suit."); *Nelson* v. *Krusen* (Tex. 1984), 678 S.W. 2d 918, 921 ("* * * the legislature has no power to make a remedy by due course of law contingent on an impossible condition.").

Jurisdictions have also held statutes of repose in other tort areas to be unconstitutional under the relevant state constitutional open courts provisions. See, *e.g., Berry* v. *Beach Aircraft Corp.* (Utah 1985), 717 P. 2d 670 (products liability); *Daugaard* v. *Baltic Co-Op Bldg. Supply Assn.* (S.D. 1984), 349 N.W. 2d 419 (products liability); *Jackson* v. *Mannesmann Demag Corp.* (Ala. 1983), 435 So. 2d 725; and *Overland Constr. Co.* v. *Sirmons* (Fla. 1979), 369 So. 2d 522 (improvements to realty).

[12] The due course of law provision is found at Section 1, Article I of the Ohio Constitution and reads "[a]ll men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety."

erty, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

There is no question that the legislature may legislate. While carrying out this function, however, the legislature cannot contravene the Constitution. This court should not be a party to the closing of the courtroom door before a plaintiff is even able to discover that he has good cause for judicial redress. The United States Supreme Court has said of statutes of limitations that "[i]t may be properly conceded that all statutes of limitation must proceed on the idea that the party has full opportunity afforded him to try his right in the courts. A statute could not bar the existing rights of claimants without affording this opportunity; *if it should attempt to do so, it would not be a statute of limitations, but an unlawful attempt to extinguish rights arbitrarily, whatever might be the purport of its provisions.* * * *" *Wilson* v. *Iseminger* (1902), 185 U.S. 55, 62. (Emphasis added.)

R.C. 2305.11(B) severs the existing rights of both adults and minors injured by the negligent acts of those in the health-care profession without affording these individuals the opportunity to try these rights in the courts. Clearly, R.C. 2305.11(B) arbitrarily extinguishes these rights within the contemplation of *Wilson* v. *Iseminger, supra.* Thus, R.C. 2305.11(B) unconstitutionally deprives individuals of their rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

The equal protection provision of the United States Constitution requires that, absent the existence of a suspect classification, a statutory classification may be set aside only if that classification rests on grounds not rationally related to the achievement of the state's objective. *San Antonio Indep. School Dist.* v. *Rodriguez* (1973), 411 U.S. 1, 33-34. This court has previously established the purpose of the legislation which enacted R.C. 2305.11(B). This legislation was an emergency measure "[n]ecessary for the immediate preservation of the public peace, health, and safety. The reason for such necessity * * * [lay] in the fact that immediate action * * * [was] necessary to insure a continuance of health care delivery to the citizens of Ohio." *Denicola* v. *Providence Hospital* (1979), 57 Ohio St. 2d 115, 120 [11 O.O.3d 290].

If R.C. 2305.11(B) fails to further this legislative objective, then R.C. 2305.11(B) fails to be rationally related to the legislative purposes, and does not survive equal protection analysis.

The basis of the statute is the assumption that since it prevents injured patients from recovering for the negligent acts of the health-care providers which caused those injuries, insurance companies will not pay as much to injured victims. Medical malpractice insurance rates will then either decrease or at least not unreasonably increase. Thus, there will be no incentive for health-care providers to relocate to lower insurance-rate areas or to seek work elsewhere. R.C. 2305.11(B) does not enhance the availability of medical services. Research has revealed no authorities

which contend that due to the high cost of malpractice insurance, it is no longer profitable to be a health-care provider. See *Keeton* v. *Mansfield Obstetrics & Gynecology Assoc., Inc.* (Mar. 5, 1981), N.D. Ohio No. C80-1573A, unreported. Nor is there any evidence that the medical profession has at any time been in danger of extinction. Thus, I find no rational connection between R.C. 2305.11(B) and the purposes for which it was enacted. Therefore, R.C. 2305.11(B) fails to pass constitutional muster as it violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.[13]

I hasten to add that this analysis in no way involves weighing the wisdom of the legislative enactment—although the lack of wisdom of a statute which shifts the risk of practicing medicine from a health-care provider to the health-care recipient who is required to subsidize the provider's costs in spite of the fact that he is the party least able to bear such costs is self-evident.

In light of the foregoing, I believe that R.C. 2305.11(B) should be held unconstitutional as to all the citizens of Ohio.

DOUGLAS, J., concurring. I concur in the syllabus and the judgment of the majority decision, but I find it necessary to write separately to make several points. I do so because it is my judgment that the magnitude of the decision each of us makes today cannot, even now, be imagined. Today's decision determines at least nineteen other cases now pending before this court. Of course, we have no way of knowing how many other cases pending around the state will be affected by our decision, but they must be legion. Further, the inevitability of fact patterns developing in the future that will be governed by our decision should be considered by each of us as we proceed to make what is, in my judgment, one of the most important decisions of our judicial careers. Therefore, more than ever, it is important that we be clear, precise, unequivocal and most importantly—fair—in our pronouncement so that the appropriateness of, and necessity for, our decision is understood. This area of the law has been a mass of confusion far too long—confused for judges, lawyers, doctors and citizens of Ohio who have found themselves involved in a legal matter concerning actual or

---

[13] Several jurisdictions have analyzed the problem of the overlap of statutes of repose and the accrual of a cause of action upon the discovery of the injury with respect to the equal protection provisions of state and United States Constitutions both in the area of medical malpractice and in other tort areas, most notably negligent improvements to real property. Numerous jurisdictions have held that the statutes of repose violate the equal protection and other provisions of the relevant Constitutions. See, *e.g., Austin* v. *Litvak* (Colo. 1984), 682 P. 2d 41 (three-year statute of repose violates equal protection mandate); *Shessel* v. *Stroup* (1984), 253 Ga. 56, 316 S.E. 2d 155 (medical malpractice); *Kenyon* v. *Hammer* (1984), 142 Ariz. 69, 688 P. 2d 961; *McClanahan* v. *American Gilsonite Co.* (D. Colo. 1980), 494 F. Supp. 1334 (construction claims); *Overland Constr. Co.* v. *Sirmons* (Fla. 1979), 369 So. 2d 572; *Skinner* v. *Anderson* (1967), 38 Ill. 2d 455, 231 N.E. 2d 588; *Kallas Millwork Corp.* v. *Square D Co.* (1975), 66 Wis. 2d 382, 225 N.W. 2d 454.

alleged medical malpractice. The time has come to put this confusion to rest.

The majority decision discusses some of the history of this issue and the trilogy of cases of *Vance* v. *St. Vincent Hospital* (1980), 64 Ohio St. 2d 36 [18 O.O.3d 216]; *Schwan* v. *Riverside Methodist Hospital* (1983), 6 Ohio St. 3d 300; and *Opalko* v. *Marymount Hospital, Inc.* (1984), 9 Ohio St. 3d 63. I agree generally with that discussion with some exceptions and additions which will be set forth *infra*.

It will also be noted that there is no statement of facts in the majority opinion from any of the four cases we decide today. This is unfortunate but easily explainable. These cases were all decided in the courts below on points of procedure and law and thus factual matter in each of the records is, at best, sparse. When this court indicates that the cases before us were previously decided on Civ. R. 12(B)(6) motions or on summary judgments, such terminology will have meaning to judges and lawyers, but will be of little or no help to readers, such as physicians and patients, who will be affected by the decisions. Likewise, journalists whose responsibility it is to impart our decisions to a needing-to-know public could not be faulted for a less than clear and accurate report if our pronouncements do not contribute to precise reporting.

It is for these reasons that I write separately and also to make clear what I think the law is and what it should be on the questions before us. In addition, because we have no actual facts before us to which readers might apply our decision, I will present a hypothetical set of facts. I do so conceding at the outset that the example may be criticized as being fanciful or even outrageous, but I would argue that it fairly depicts the issues that have, do and could arise under the statute in question, R.C. 2305.11(B). I also give the example in these terms not only to illustrate the point but also to avoid any suggestion that the facts given are from an actual case that might yet remain to be decided.

It is with these preliminary thoughts that I proceed.

## I

Ohio and many other states were influenced by the so-called malpractice crisis of the 1970s. Whether there was or was not a crisis has been extensively debated and there is credible evidence on both sides of the question. Nevertheless, such discussions are unimportant to our decision today as the questions before us are purely ones of law. We do no service to anyone to merely rehash what has gone on before except where it is of precedential value.

In response to the "crisis," Ohio's General Assembly enacted, in 1975, amended R.C. 2305.11. For our purposes, the pertinent parts of the statute state:

"(A) An action for * * * malpractice, including an action for malpractice against a physician, podiatrist, hospital, or dentist, * * * shall be

brought within *one* year after the cause thereof *accrued*[14] * * *. [Footnote and emphasis added.]

"(B) In no event shall any medical claim against a physician * * * be brought *more than four years after* the act or omission constituting the alleged malpractice *occurred.*[15] The limitations in this section for filing such a malpractice action against a physician * * * apply to all persons *regardless of legal disability* and notwithstanding section 2305.16 of the Revised Code, provided that a minor who has not attained his tenth birthday shall have until his fourteenth birthday in which to file an action for malpractice against a physician or hospital. [Footnote and emphasis added.]"

Thus, regardless of discovery, pursuant to R.C. 2305.11(B), a patient's cause of action is time barred upon the expiration of four years from the date of the *occurrence* of the malpractice. In effect, this clearly permits the extinguishment of a cause of action *before* it even accrues. The rationale for this statute of repose was to limit physician liability to a reasonable period of time in order to allow insurance companies to reduce their then-

---

[14] It is of critical importance to make the distinction between the word "accrued" in R.C. 2305.11(A) and the word "occurred" in R.C. 2305.11(B). In *Oliver* v. *Kaiser Community Health Found.* (1983), 5 Ohio St. 3d 111, this court held that a cause of action for medical malpractice *accrues* at the time when a patient *discovers* or should have discovered the injury. Thus, the statute of limitations does not begin to run until a patient knows or should have known that malpractice had taken place. That patient then has one year from the date "of discovery" to bring an action, regardless of when the malpractice took place or occurred. *Occurred* is a more precise word not usually needing interpretation. Webster's Ninth New Collegiate Dictionary (1983) 817, defines *occur* as "appear"; "to come into existence." Thus, under amended R.C. 2305.11(B), if the malpractice had come into existence — occurred — and was discovered *subsequent* to four years after the happening, any patient so suffering was barred from bringing any action against the physician. This is true, pursuant to R.C. 2305.11(B), for *all* patients whether they be adults or minors and even if, during the four-year period, the patient is of unsound mind or is imprisoned. This provision must be contrasted with R.C. 2305.16 which provides that in any other type of case, except medical malpractice (with a few exceptions not pertinent here), the time for bringing suit is "tolled" while the alleged aggrieved party is under some disability such as being a minor, being of unsound mind or being imprisoned. Under R.C. 2305.16, such a person has the full period of limitation to bring his or her suit *after* the disability has been removed.

A good contrasting example is legal malpractice. If a person suffers malpractice by a lawyer, and that person is a minor (below the numerical age of eighteen) or is of unsound mind, that person has, if the legal malpractice has been discovered during the period of disability, a period of one year *after* the disability is removed to bring an action. Thus, in the case of a minor, the minor would have, at the least, until his or her nineteenth birthday to bring an action. If the legal malpractice had not been "discovered," then the time for bringing suit would be even longer. The action would not be time-barred until one year had elapsed from the date of discovery. See *Skidmore & Hall* v. *Rottman* (1983), 5 Ohio St. 3d 210, and R.C. 2305.11(A). Thus, it is only physicians who are placed in this special category of being privileged or exempt, after a limited period, from liability for injury caused by their negligence.

[15] See fn. 14, *supra.*

current medical malpractice insurance premiums since the possibility of future claims was greatly reduced and could then be calculated based upon the physician's patient load and type of practice. Without saying more on this matter (and there is a multitude of empirical data available), suffice it to say that not only did reductions in premiums not occur, tremendous increases in premiums continued.

Thus, the legislature acceded to the demands of insurance companies and physicians to restrict the rights of persons, suffering from alleged medical malpractice, from bringing an action later than four years from the date of the occurrence. The legislation has had the effect in some cases, and the *possibility* in all cases involving minors and incompetents, of closing the doors of the courthouse. A minor who has suffered malpractice may not bring an action in Ohio's courts in his own right because, pursuant to Civ. R. 17(B), a minor cannot sue in his own name. Thus, if a parent or next friend either neglects or declines, for whatever reason, to bring the action, by the time the minor reaches the age of majority the four-year statutory period may have expired and thus the minor who, by law, was prohibited from suing because of age, now cannot sue because the time has expired. Even worse is the minor who herself has a child. The mother has no standing to sue for alleged malpractice and, of course, neither does her baby. Or take an incompetent who suffers medical malpractice and is not restored to competency until five years later. Such a person would, because of the lapse of time, be barred from suing even though that person would not have had the mental competency or the legal ability to proceed with a cause of action. Worse yet is the case where the medical malpractice is not even discovered during the four-year period. Consider the following fact pattern, impractical perhaps, but nevertheless graphically illustrative of the problems.

Mary, a young lady sixteen years of age, suffers discomfort in her abdominal area. Her parents seek medical attention for her and she is diagnosed as having appendicitis. Upon hospitalization, an "appendectomy" is performed. Three years later our subject gets married and, after a time lapse of two years when she still has not conceived, she and her husband seek medical advice. Upon examination, the doctor asks Mary when she had been surgically sterilized. Mary says that never happened and the doctor assures her that it did. Upon checking, it is found that, sure enough, Mary had been accidentally but negligently sterilized during the appendectomy. Malpractice is admitted but no recovery for damages is permitted Mary because more than four years had elapsed since the date of the *occurrence*. Therefore, Mary's claim has been effectively extinguished before the claim has ever *accrued*. Stated another way, before Mary even gets a turn at bat, the game is declared over and she is declared the loser.[16] Is this right or fair? Is fair or right even the issue?

---

[16] Contrast this situation even further with R.C. 2305.10 which reads, in part, that "[a]n

It has been argued to us at oral hearings on these cases that whether or not such a rule is right or fair is not for us to decide. It is argued that it is the job of the legislature to determine, on behalf of our citizens, what is right and fair and that the only right, prerogative or responsibility of this court is to determine whether what the legislature has enacted is constitutional. I am persuaded by this argument and, therefore, proceed to consideration of the case precedent (*stare decisis*) and the constitutional questions which the cases now before us present.

## II

As indicated in the majority opinion, this court has dealt with this statute, R.C. 2305.11(B), on several occasions. The precise issue before us now is whether this section of the law is constitutional. It is a mystery to me why we have all of these cases before us or, at least why we now have any difficulty in deciding them.

The majority opinion herein, in discussing *Schwan, supra,* states that "* * * [i]n applying the pertinent test for equal protection, we determined that the *final clause* of R.C. 2305.11(B) failed the 'rational basis' test, and was therefore unconstitutional." (Emphasis added.) In footnote 2 the majority opinion states, in discussing the final clause of R.C. 2305.11(B), that "[w]e held the *emphasized language* unconstitutional in *Schwan* v. *Riverside Methodist Hospital* (1983), 6 Ohio St. 3d 300. * * *" (Emphasis added.) These two statements are not accurate.

While I concede that the issue before the *Schwan* court was whether it was a rational classification to treat minors between the ages of ten and fourteen differently than other minors, the fact is that the syllabus in *Schwan* reads as follows:

"R.C. 2305.11(B) is unconstitutional with respect to malpractice litigants who are minors. (*Vance* v. *St. Vincent Hospital,* 64 Ohio St. 2d 36 [18 O.O.3d 216], and all other inconsistent cases, overruled.)"

This syllabus is clear and unequivocal. There is nothing to be found in the syllabus that would suggest that *only* the *last clause* of R.C. 2305.11(B) was being found unconstitutional. The *entire* subsection (B) is found unconstitutional and that includes, of course, all of the language in the subsection, including the four-year bar and the "tolling" language.

It is well-established that the syllabus of an opinion issued by this court

---

action for bodily injury * * * shall be brought within two years after the cause thereof arose. * * *" In this section there is no provision "tolling" the statute of limitations. Thus, R.C. 2305.16 permits Mary, if she had suffered the injuries in a *car accident* in which her doctor was at fault, to bring her cause of action for the injuries received within two years *after* she reached her eighteenth birthday — and, of course, Mary would have known of the occurrence of the accident and would have known, *within a reasonable period of time,* if any injury had taken place. It seems strange that in *provable* medical malpractice cases, where the doctor has almost absolute control, he is better protected time-wise than where he negligently injures a minor in a traffic accident.

states the law of the case. *Smith* v. *Klem* (1983), 6 Ohio St. 3d 16, 18; *Cassidy* v. *Glossip* (1967), 12 Ohio St. 2d 17 [41 O.O.2d 153], paragraph six of the syllabus. As such, all lower courts of this state are bound to adhere to the principles set forth therein. "A syllabus is the law of the case establishing principle and doctrine, binding alike on citizens and courts, both inferior and of equal rank." *Merrick* v. *Ditzler* (1915), 91 Ohio St. 256, 264.

I recognize it will be argued that the syllabus of the case is not the law if the syllabus, in whole or in part, is *obiter dictum.* There are some cases that have discussed variations of this question but this court laid all of that to rest in *Klem, supra,* where we said, at 18, "[i]n the past, this court has examined the syllabi of several of its cases and concluded that when *obiter dictum* appears therein it must be so recognized and considered. * * * *However, that determination is a function reserved exclusively for this court. Until such a determination is made, the syllabus is presumed to be the law of the case and all lower courts are bound to adhere to the principles set forth therein.*" (Emphasis added.) Five of the present members of this court concurred in *Klem* which, incidentally, was decided just forty-two days before *Schwan.* I am painfully aware of the case because the decision of this court reversed the decision of the Sixth District Court of Appeals and I authored the decision as a sitting member of that court.

Having now established the foregoing, it should be clear that if on no other basis than *stare decisis,* the syllabus in *Schwan* should be followed and R.C. 2305.11(B) should be declared unconstitutional in its entirety. It really makes little difference if this is done on equal protection, due process or access-to-the-courts grounds. See discussion *infra,* at Part III.

It is also too late to now argue that the syllabus in *Schwan* was broader than this court intended as was attempted in the *per curiam* opinion of *Opalko* v. *Marymount Hospital, Inc.* (1984), 9 Ohio St. 3d 63. Lawyers and litigants all over this state depended on the syllabus of *Schwan* to have said what it meant. Many cases were not filed within the parameters of R.C. 2305.11(B) because it was no longer in existence. To now penalize those persons so relying would not only be unfair—it would be just plain wrong. Why should lawyers be subjected to claims of legal malpractice when their actions have been dictated by reliance on a pronouncement of this court.

*Opalko* is an aberration and it should be recognized as such and overruled. How could *Opalko,* or any other case, make constitutional what had already been declared unconstitutional? To permit such activity would be to remove all stability from the law. As long ago as 1886, the United States Supreme Court said in *Norton* v. *Shelby Cty.* (1886), 118 U.S. 425, 442, that "[a]n unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed." Any attempt through *Opalko* to breathe life back into R.C. 2305.11(B) is ill-

conceived and unlawful. The language in *Opalko,* in interpreting the *Schwan* case, made the same errors as does today's majority opinion. The syllabus in *Schwan* said that R.C. 2305.11(B) was unconstitutional—all of the section, not just part. Therefore, whatever *Opalko* decided (and I have never been sure what was meant or decided) was wrong and, as such, provides no precedential authority.

Accordingly, based on *Schwan,* this court must reaffirm our holding that R.C. 2305.11(B) is unconstitutional thereby deciding the cases now before us. But there is, for so holding, even a better reason, than just previous case authority and *stare decisis.* The reason is that R.C. 2305.11(B) is, in fact, unconstitutional!

### III

I begin, of course, with the presumption that the challenged statute is valid. Its wisdom is not the concern of the courts. If a challenged law does not violate the Constitution, it must be sustained.

Section 16, Article I of the Ohio Constitution states: "[a]ll courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law * * *."

Having roots in the Magna Carta, "access to the courts" provisions, found in many state constitutions, were designed to place some limitation on governmental power. As early as 1882 in *Lafferty* v. *Shinn* (1882), 38 Ohio St. 46, 48, this court said "[t]hat 'all courts shall be open, and every person for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law,' is ordained in the constitution (art. 1, § 16); *and it is not within the power of the legislature to abridge the period within which an existing right may be so asserted as that there shall not remain a reasonable time within which an action may be commenced.* * * *"* (Emphasis added.)

It is here that I differ with the opinion of my brethren in the majority, although the result is the same. The majority opinion says, "* * * we are asked to review the constitutionality of R.C. 2305.11(B) as it relates to minors in light of *due process considerations.*" (Emphasis added.) Review in this light could very well lead to the result that the statute in question *does* meet constitutional muster. The reason for this is clear. The effect of a statute of repose,[17] at least in the medical malpractice area, is to reduce the doctor's exposure to liability by granting to him immunity from suit after the limitations period has run. Such protection may be justified on strong claims of public policy and, therefore, not constitutionally infirm

---

[17] Some confusion arises as to terminology between a statute of limitations and one of repose. This confusion necessarily affects the ultimate result herein. A true statute of limitations works on the *remedy* rather than the *right* and governs the time within which a legal proceeding must be instituted after a *cause of action accrues* (is discovered). A statute of repose is not a true statute of limitations, but rather is an absolute bar to a cause of action ever arising. R.C. 2305.11(B) is a statute of repose.

under either the equal protection or due process clauses. See, generally, Redish, Legislative Response to the Medical Malpractice Insurance Crisis: Constitutional Implications (1977), 55 Tex. L. Rev. 759. The same would not hold true, however, when measured against the "access-to-the-courts" provision of Section 16, Article I of the Ohio Constitution.

It will be argued that in striking down this statute of repose, we will be usurping the prerogatives of the legislature and that no statute of limitations will be safe from our review. Nothing could be further from the truth. The establishment of time limitations on various causes of action is a policy matter within the particular purview and competence of the legislature, but any such legislation must fall if it interferes with a person's constitutionally guaranteed right of access to the courts when that person is asserting a right of action arising at common law.

The action for negligence, upon which today's medical malpractice actions are founded, was well-established in the common law (trespass of the case). Where a right or action existed at common law at the time the Constitution was adopted,[18] that right is constitutionally protected, by the

---

[18] There has been a recurring question of whether actions existing at common law were preserved as part of the law of this state after Ohio, having been part of the Northwest Territory, was granted statehood.

On July 13, 1787, the Congress of the United States passed an ordinance for the government of the territory of the United States, northwest of the river Ohio. In part, the ordaining clauses of the ordinance provided that "[t]here shall also be appointed a court to consist of three judges * * * who shall have a *common law* jurisdiction * * *." (Emphasis added.) 1 Stat. of Ohio (Chase 1833) 67. Article II of the ordinance provided, in part, that "[t]he inhabitants of the said territory shall always be entitled to the benefit of the writ of habeas corpus * * *, and of judicial proceedings according to the course of the *common law; * * *.*" (Emphasis added.) *Id.* at 68.

Pursuant to the ordinance, a Governor and judges were appointed. These persons had the authority to make laws for the territory and in 1788 they adopted, among other laws, a statute of limitations for all of the common-law actions including trespass on the case. *Id.* at 102. In 1795, "[a] law declaring what laws shall be in force" for the territory was adopted. It read, "[t]he common law of England, all statutes or acts of the British parliament made in aid of the common law * * * and also the several laws in force in this territory, shall be the rule of decision * * *." *Id* at 190-191. Thus, the law of the territory, part of which was to become the state of Ohio, in this pre-statehood period was the "common law" as described.

We have seen that an action for injury caused by negligence (case) was a common-law right. Subsequently, the state of Ohio was formed and the Constitution of Ohio, 1802, was adopted. Section 7, Article VIII of that Constitution provided "[t]hat all courts shall be open; and every person, for an injury done him in his lands, goods, person, or reputation, shall have remedy by the due course of law, and right and justice administered, without denial or delay." This provision became Section 16, Article I of the Constitution of Ohio, 1851.

Thus, the common-law right of action for trespass on the case was now accorded constitutional status by the language that the courts *shall* be open to citizens for injury done them to their person. Additionally, the transition schedule in the 1802 Constitution, as if to emphasize the point, provided in Section 4 that "[a]ll laws * * * now in force in this territory, not inconsistent with this constitution, shall continue and remain in full effect, until repealed by the legislature * * *." Obviously, as the Constitution was a compact with the people of the state, the legislature had no authority to repeal that which was now contained in the Constitution.

access-to-the-courts provision, from subsequent legislative action which abrogates or impairs that right without affording a reasonable substitute. See, generally, *Gentile* v. *Altermatt* (1975), 169 Conn. 267, 363 A. 2d 1. Cf. *Haskins* v. *Bias* (1981), 2 Ohio App. 3d 297. Thus, through the theory of "constitutional incorporation," one of construction, legislation which serves to abolish or severely impair common-law remedies existing at the time the Constitution was adopted is invalid unless a reasonable substitute is provided for the remedy which is lost. Conversely, where a party would not have had a right to bring an action at common law, either because no cause of action existed or because some bar prevented its assertion, the cause of action is not constitutionally incorporated by the adoption of the access-to-the-courts provision. If a party received a subsequent right of action, not recognized at common law, either through legislative enactment or judicial pronouncement, that right could properly be abrogated by the legislature even without affording a reasonable substitute. Any right of action created subsequent to the access-to-the-courts provision exists only as a matter of judicial or legislative grace and may be withdrawn at any time.

It is within this context that we must consider the statute of repose set forth in R.C. 2305.11(B). We have already seen that the statute provides for an *absolute* bar of a cause of action for medical malpractice after a four-year period of time has elapsed from the date of the *occurrence*—that is, the date on which the alleged malpractice took place. It can readily be seen that where the injury is not discovered within the prescriptive period, the effect of the repose is to abolish the party's right of action altogether. A person so situated is literally given no opportunity to bring his action because the right to proceed is obliterated before it even *accrues*. In actual effect, this abolition grants the negligent doctor an area of absolute immunity from suit at the expense of the patient's constitutionally guaranteed right to access to the courts. This is especially true of those suffering from some disability such as we have in the cases before us, to wit: not having reached the statutory age of an adult.

---

In fact Section 28, Article VIII of the 1802 Constitution provided that, "[t]o guard against the transgression of the high powers, which we had delegated, we declare, that all powers not hereby delegated, remain with the people." There was no, nor could there be, delegation to the legislature to repeal any part or all of the Constitution. Yet that, in effect, is what the statute of repose, R.C. 2305.11(B), does as it potentially eliminates the bringing of a cause of action before it even is known to exist. The legislative enactment states, in effect, that such claims are not injuries or that the injury never existed. If the legislature would be permitted to so decree, then the constitutional provision becomes meaningless.

The Constitution is either a superior law, unchangeable except by extraordinary means, or it is on a level with ordinary legislative acts and, like other acts, is alterable at the pleasure of the legislature. If the Constitution is a superior law, then a legislative act that is contrary to the Constitution is not the law. If the Constitution is on the level of ordinary legislative acts, then written constitutions are absurd attempts, on the part of the people, to limit a power which is, by its own nature, illimitable.

Since the bottom-line effect of this statute of repose, R.C. 2305.11(B), is to abolish a common-law right or action which existed at the time the Constitution was adopted, and since the legislature provided no reasonable alternative remedy or substitute for the one which it has abrogated, this court must hold that R.C. 2305.11(B) is violative of Section 16, Article I of the Ohio Constitution and is, therefore, unconstitutional. "These rights the legislature did not give * * * and the legislature can not take them away.* * *" *Byers* v. *Meridian Printing Co.* (1911), 84 Ohio St. 408, 422.

## IV

I am disappointed that the majority opinion, by way of footnote 6, leaves to another day the question of the constitutionality of R.C. 2305.11(B) as it applies to adults. Whether on due process grounds, as the majority opinion has found, or on the access-to-the-courts provision of Section 16, Article I, as I have indicated, the statute in question is unconstitutional. I would concede that all of the cases before us involve claims by minors but it would seem to logically follow that where due process rights of minors are found to be violated, the same situation must exist for one who has reached the age of majority.

It is true that most adults do not suffer the same disabilities as do minors with regard to having capacity, ability and standing to sue, but adults have, nevertheless, and will find themselves in the same position as minors of having their rights foreclosed even before they accrue. Like minors, adults need relief from this unconstitutional statute which deprives them of their rights. "Justice in this case cries out for a remedy. How can *anyone* be precluded from asserting a claim by a statute of limitations which expires before the discovery of the injury? How can anyone charged with the responsibility of administering justice allow such an absurdity?" (Emphasis added.) *Amer* v. *Akron City Hospital* (1976), 47 Ohio St. 2d 85, 93 [1 O.O.3d 51] (Celebrezze, J., dissenting).

Accordingly, it would be better if the syllabus in today's decision would not have included the words "as applied to minors."

## V

It should be noted that a number of cases were reversed by the Lucas County Court of Appeals on the authority of *Mominee* v. *Scherbarth,* our case No. 85-688. Several of these cases were consolidated by this court for oral argument. During argument, the point was made, by at least two appellants, that included in their cases were other issues and parties not specifically involved with the constitutionality of R.C. 2305.11(B). Where accurate this decision will not, of course, affect those parties or issues. This will likewise apply to the many other cases that will be decided by this court on the authority of today's decision and reversed or affirmed, and announced, by journal entry. Upon remand, these matters will be considered by the respective trial courts to which the cases have been remanded.

Accordingly, I would affirm the judgment of the Court of Appeals for Lucas County in case No. 85-688 and I would reverse the Court of Appeals for Cuyahoga County in case No. 85-1039.

HOLMES, J., dissenting. This court has previously set forth the legislative purpose of Am. Sub. H.B. No. 682 (136 Ohio Laws, Part II, 2809, 2843-2844), when considering a number of the sections of law included therein. In *Denicola* v. *Providence Hospital* (1979), 57 Ohio St. 2d 115 [11 O.O.3d 290], paragraph three of the syllabus, the court held that R.C. 2743.43 was not violative of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. In that case it was stated that the legislation "declares the Act to be an emergency measure, stating: '[N]ecessary for the immediate preservation of the public peace, health and safety. The reason for such necessity lies in the fact that immediate action is necessary to insure a continuance of health care delivery to the citizens of Ohio.'

"Specifically, the General Assembly was legitimately concerned with the competency of medical malpractice experts testifying in medical malpractice claims, and the profound impact of such cases on the availability of medical malpractice insurance and resulting availability of health care in Ohio." *Id.* at 120.

In *Vance* v. *St. Vincent Hospital* (1980), 64 Ohio St. 2d 36 [18 O.O.3d 216], the court in construing R.C. 2305.11 noted at 42 that the constitutionality of the section was not at issue and at 40 set forth the public policy of the legislature in enacting Am. Sub. H.B. No. 682. The court stated that: "The legislation was comprehensive in nature and consisted of a response to what was largely perceived throughout the country to be a medical malpractice 'crisis' manifested by sharply increased medical malpractice insurance premiums, cancellation of policies, and physician work slowdowns or stoppages." *Id.* at 40.

*Beatty* v. *Akron City Hospital* (1981), 67 Ohio St. 2d 483 [21 O.O.3d 302], construed R.C. 2711.21 and held that such section is constitutional as against claims of violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Section 2, Article I of the Ohio Constitution. This court again pointed out the public policy of the Medical Malpractice Act by stating, at 495: "The Ohio General Assembly, after appropriate study and debate on the subject, recognized the urgency of implementing a reasonable and effective means of helping alleviate the adverse economic and social impacts of this medical provider crisis. It is beyond reasonable question that the General Assembly has a legitimate interest in protecting the health of its citizens as well as the economic and social stability of the state in this area of concern. Concluding as they must have that the increased number of medical claims was the cause of the dramatic rise in the cost of medical malpractice insurance, and thus the cause of the rise in the cost of providing

medical services to the public, it was only rational for the General Assembly to deal with such claims in the manner provided in the Act."

In *Baird* v. *Loeffler* (1982), 69 Ohio St. 2d 533 [23 O.O.3d 458], this court construed R.C. 2305.11(B), as amended effective July 28, 1975, and held that the section was a bar to a claim of a minor whose cause of action accrued in 1972, but was not filed until March 1980.

I dissented in *Schwan* v. *Riverside Methodist Hospital* (1983), 6 Ohio St. 3d 300, which overruled *Vance, supra.* In *Schwan,* the majority held that R.C. 2305.11(B) was unconstitutional as it related to malpractice litigants who are minors. In *Opalko* v. *Marymount Hospital, Inc.* (1984), 9 Ohio St. 3d 63, this court, in reviewing the application of R.C. 2305.11(B), stated that such section had previously been found unconstitutional only as it would relate to the equal protection rights of minors and not the four-year bar contained in the latter portion of the section. The court thereupon pronounced that an action brought five and one-half years after the date on which the cause of action had accrued would be barred by the absolute four-year bar.

It should also be noted that in both *Schwan* and *Opalko* we had, in the main, the very issue before us which is presented in the case *sub judice.* In *Schwan,* the court of appeals held R.C. 2305.11(B) unconstitutional in light of R.C. 2305.16. In *Opalko,* what remained of the four-year bar was expressly declared constitutional " 'notwithstanding * * * [R.C.] 2305.16.' " See *Opalko, supra,* at 64.

This majority opinion merely retraces the steps in the review of the legislative enactment, and concludes differently than had other reviewing panels of this court. My position remains the same as I previously enunciated, and I find that the legislative pronouncement of public policy was, and remains, clear, that the four-year statute of limitations or repose should apply to all actions brought sounding in medical malpractice either by minors or adults.

Accordingly, I dissent from the opinion of the majority.

WRIGHT, J., dissenting. The majority holds that the application of the four-year bar to minors is unconstitutional in that it violates the due course of law provision, Section 16, Article I, of the Ohio Constitution. I am surprised at how easily the majority reaches this conclusion, substituting its convictions for those of the General Assembly.

At the outset, it must be kept in mind that it is not the function of this court to pass judgment upon the wisdom of a legislative enactment. A statute can be unwise, but nevertheless constitutional. *State* v. *Dorso* (1983), 4 Ohio St. 3d 60. As Judge Zimmerman stated in *State, ex rel. Bishop,* v. *Bd. of Edn.* (1942), 139 Ohio St. 427, at 438 [22 O.O. 494]:

" * * * [A]ttention is directed to the universally recognized principle that a court has nothing to do with the policy or wisdom of a statute. That is the exclusive concern of the legislative branch of the government. When

the validity of a statute is challenged on constitutional grounds, the sole function of the court is to determine whether it transcends the limits of legislative power."

The principle articulated by Judge Zimmerman acts as a significant limitation on the power of this court in the interpretation of the Constitution and the determination of whether or not the legislative enactment violates its provisions. A court may intervene only when convinced that the statute violates a provision of the Constitution. Woodbridge, A History of Separation of Powers in Ohio: A Study in Administrative Law (1939), 13 U. Cin. L. Rev. 191.

While the public policy considerations are dissimilar, the clash over this court's role as a maker of law vis-a-vis the legislative prerogative is strikingly similar to the conflict which developed fifty years ago between the United States Supreme Court and the Congress. As the reader may recall, the court's "conservative" majority struck down a series of legislative acts designed to ameliorate the effects of the Great Depression. The "liberal" minority on the court deplored this form of judicial activism. Time and human frailty cured the conflict.[19] A like situation may accrue here.

The often repeated theme contained in the majority opinions is disagreement with the legislative classification contained in R.C. 2305.11(B). Is this our function? I think not and say this despite my empathy with the claimants in the various cases we have before us. Regardless of the wisdom of the enactment, the sole question to be resolved by this court is whether the statute is rationally related to a legitimate state purpose.[20]

As previously recognized by this court, the 1975 amendment to R.C. 2305.11 was part of a comprehensive plan designed to ameliorate a malpractice insurance crisis that threatened our health-care delivery system.[21] See *Denicola* v. *Providence Hosp.* (1979), 57 Ohio St. 2d 115, 120 [11

---

[19] Cf. *Carter* v. *Carter Coal Co.* (1936), 298 U.S. 238, and *NLRB* v. *Jones & Laughlin Steel Corp.* (1937), 301 U.S. 1.

[20] At no time does the majority identify a fundamental property or liability interest upon which the statute can be said to impinge. Thus, the proper test to be invoked in considering whether R.C. 2305.11(B) violates due process of law is whether the enactment is rationally related to the public health, safety, morals or welfare.

[21] In Section 8 of Am. Sub. H. B. No. 682, the General Assembly set forth the legislative purpose of the amendments: "This act is hereby declared to be an emergency measure necessary for the immediate preservation of the public peace, health, and safety. The reason for such necessity lies in the fact that immediate action is necessary to insure a continuance of health care delivery to the citizens of Ohio. * * *" (136 Ohio Laws, Part II, 2809, 2843-2844.) The emergency to which the legislature refers in Am. Sub. H. B. No. 682 is one which has been documented by various commentators both pre- and post-1975. See, *e.g.,* United States Department of Health, Education and Welfare, Report of the Secretary's Commission on Medical Malpractice (1973); Sheehan, The Medical Malpractice Crisis in Insurance: How It Happened and Some Proposed Solutions (1975), 11 Forum 80; Gouldin & Gouldin, The

O.O.3d 290]; *Vance v. St. Vincent Hosp.* (1980), 64 Ohio St. 2d 36, 40 [18 O.O.3d 216]; *Beatty v. Akron City Hosp.* (1981), 67 Ohio St. 2d 483, 494-495 [21 O.O.3d 302].

The public policy considerations that prompted the legislature to take action to amend Ohio's malpractice laws appear to be valid, reasonable and necessary. Prior to July 28, 1975, the statutory and judicial exceptions to the one-year statute of limitations for medical malpractice gave rise to long-term liability exposure for potential defendants which made it difficult for medical malpractice insurers to make accurate predictions regarding their future liability. Destabilization of the medical malpractice insurance market followed, resulting in dramatically increased premiums and unavailability of coverage at any cost to certain high-risk specialties and institutions. See Comment, Medical Malpractice and the Statute of Limitations in Ohio (1981), 10 Cap. U. L. Rev. 771.

The 1975 amendment to the statute of limitations was specifically designed to curtail one of the primary causes of the malpractice crisis—the long-tail liability factor[22]—by placing an absolute, calculable outside limit of four years on all claims. The General Assembly's response to the nationwide crisis was similar to that of a number of our sister states. By 1978, like statutes imposing an absolute bar had been enacted by twenty-four jurisdictions.[23] See 1B Hosp. Law Manual, Negligence (Supp. 1978), Section I:30(1).

The 1975 amendment eased the malpractice crisis by placing a reasonable cutoff on malpractice actions, which minimized problems of proof of stale claims, while still providing the potential plaintiff a reasonable time to file suit. As the *amicus curiae,* Ohio Hospital Association, has stated, under the pre-1975 version of the malpractice statute of limitations, claims arising from acts occurring at childbirth could be delayed as long as nineteen years. With today's rapidly changing modern medical science, not only do memories fade, records become lost, and facts become stale over

---

Medical Malpractice Insurance Crisis (1975), 3 Ohio N.U.L. Rev. 510; National Conference of State Legislatures, A Legislator's Guide to the Medical Malpractice Issue (1976); ABA, Report of the Commission on Medical Professional Liability (1977).

[22] "Long-tail liability factor" is the term used to describe the effect of exceptions to the statute of limitations that leaves potential defendants exposed to lawsuits for many years after an alleged negligent act took place.

[23] The states and territories which had enacted an absolute bar by 1978 were Alabama, Colorado, Connecticut, Florida, Hawaii, Idaho, Illinois, Iowa, Kansas, Kentucky, Louisiana, Missouri, Nebraska, Nevada, New York, North Carolina, North Dakota, Ohio, Oregon, Puerto Rico, South Carolina, Tennessee, Utah, and Washington. These absolute bars range from two years to ten years, but most are three or four years. In addition to these twenty-four, in a significant number of states, the statute begins to run from the "occurrence" of the act with no provision for tolling until the injury is discovered, and a tolling period for minors which is substantially shorter than the age of eighteen. See 1B Hosp. Law Manual, Negligence (1978), Section I:30(1).

nearly two decades, but medical standards may change so dramatically that it is often difficult to reconstruct what the standard of care was nineteen years before, and patently unfair to apply today's standard to treatment rendered a generation earlier.

The majority finds that four years is an inadequate time period for a minor to bring a malpractice action and erroneously concludes that the four-year bar was not reasonably related to a proper legislative purpose. In this determination, the majority improperly substitutes its judgment for that of the legislature. The clear legislative purpose in enacting R.C. 2305.11(B) was to ease the malpractice crisis and thus prevent the collapse of our health care system. It is hardly subject to challenge that such a purpose is a legitimate exercise of the police powers of the state. No member of this court or of any other court in this nation can question the right of the elected representatives of the people, whether members of the federal or state legislature, to create or abolish within certain limitations a cause of action under the common law. The legislature has no less the right to set limitations on such actions. In *Osborn* v. *Bank of the United States* (1824), 22 U.S. (9 Wheat.) 738, 866, Chief Justice Marshall stated that "* * * [the judiciary] has no will, in any case. * * * Judicial power is never exercised for the purpose of giving effect to the will of the Judge; always for the purpose of giving effect to the will of the Legislature; or, in other words, to the will of the law."

The majority decision returns the malpractice situation regarding minors to a status similar to that existing prior to the 1975 amendment. It emasculates the legislature's method of dealing with the malpractice crisis and ignores the public policy articulated by the General Assembly through the adoption of Am. Sub. H.B. No. 682 in 1975 and the amendments to R.C. 2305.11 in 1976, 1982 and 1984.

The number of malpractice claims brought against physicians and the amount of damage awards have clearly been on the rise in recent years. Malpractice Claims Tripled in Last Decade, AMA Study Reveals (1985), 7 Hosp. Risk Mgmt. 24; Professional Negligence Awards Increase 450%, Research Shows (1982), 4 Hosp. Risk Mgmt. 95. This increase in claims and awards is affecting the affordability of malpractice insurance. While most providers can still obtain coverage in some form, malpractice insurance carriers are discontinuing occurrence-type policies and are only offering claims-made policies[24] which makes it necessary for providers to purchase coverage after they have retired or otherwise ceased their practice, or risk exposure to uninsured claims. Richards, Malpractice Losses Are Building—Again (Sept. 16, 1984), Hospitals, at 108. Additionally, the increase in claims and damage awards adds to the ultimate cost of health

---

[24] An occurrence-type policy provides coverage for any claim which is based upon an occurrence during the policy period regardless of when the claim is made. Claims-made policies only cover claims made during the policy period.

care for consumers. A 1983 study found that, in response to increased professional liability risks, forty percent of the providers prescribed additional diagnostic tests, twenty-seven percent performed additional treatment procedures and thirty-one percent increased their fees. AMA Study Shows Malpractice System Has Led to Increased Costs for Providers (1984), 6 Hosp. Risk Mgmt. 83. When these increased costs are considered in conjunction with the threat of fewer new providers choosing to enter the higher risk specialties, the ultimate result is less effective service to consumers at a greater cost.

The majority also holds that four years is an inadequate time period for a minor to bring a malpractice action even though such a suit may be brought by the minor's parents or guardian for, and on behalf of, the child. In making this determination, the majority is again substituting its judgment for that of the General Assembly. Our society relies on parents to provide all of a child's basic needs such as food, clothing and shelter. Therefore, the legislature can *certainly* make a determination that parents will bring an action on behalf of their injured child, especially since, in addition to parental concern, parents have the additional incentive of financial relief or financial benefit for the family in bringing a malpractice action.

I am satisfied that R.C. 2305.11(B) is constitutional and the application of such section to minors does not violate the due course of law provision, Section 16, Article I, of the Ohio Constitution. The enactment of R.C. 2305.11(B) in 1975 by the Ohio General Assembly was a reasonable exercise of the police powers of the state. I would predict that the invalidation of R.C. 2305.11(B) as it applies to minors will have a detrimental effect on both the health care providers and health care consumers in Ohio by increasing the cost of medical malpractice insurance which will thereby increase the cost of health care to the consumer, and by reducing the quality and availability of health care services available as providers who specialize in high-risk cases are forced out of the market.

What is truly remarkable about my brethren in the majority is their absolute refusal to consider the rational basis for the enactment of the 1975 amendment. In the words of the Psalmist, "* * * eyes have they, but they see not. They have ears, but they hear not."[25] It is disappointing that the majority has ignored the legislative response to a genuine crisis with respect to liability claims within the medical community. The General Assembly reacted to the problem in 1975. A like reaction may accrue in 1987.

Accordingly, I would reverse the judgment of the court of appeals in *Mominee* v. *Scherbarth* and affirm the judgment of the court of appeals in *Wainstein* v. *University Hospitals.*

---

[25] Psalms 115.